David P. Beitchman, SBN 198953
Michelle Seañez, SBN 2419445
**BEITCHMAN & ZEKIAN, P.C.**
16130 Ventura Blvd., Suite 570
Encino, California 91436
Telephone: (818) 986-9100
Facsimile:   (818) 986-9119

Attorneys for Plaintiff, AMIR HESHMATPOUR

FILED
CLERK, U.S. DISTRICT COURT

MAR 1 4 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                           DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| AMIR HESHMATPOUR, an individual, | Case No. CV13-01823 P(RZx) |
| Plaintiff, | **COMPLAINT FOR:** |
| vs. | 1. **LIBEL PER SE;** |
| | 2. **DEFAMATION;** |
| ALI ESMAILI, an individual; | 3. **TRADE LIBEL;** |
| SOHRAB SEPEHRAN, a/k/a SASHA | 4. **INTRUSION;** |
| SEPEHRAN, an individual; | 5. **PUBLIC DISCLOSURE OF** |
| XCENTRIC VENTURES, LLC, an | **PRIVATE FACTS;** |
| Arizona limited liability company; and | 6. **FALSE LIGHT;** |
| DOES 1 through 10, inclusive, | 7. **CIVIL EXTORTION;** |
| | 8. **TORTIOUS INTERFERENCE** |
| Defendants. | **WITH BUSINESS** |
| | **ADVANTAGE;** |
| | 9. **COPYRIGHT** |
| | **INFRINGEMENT;** |
| | 10. **CONTRIBUTORY** |
| | **COPYRIGHT** |
| | **INFRINGEMENT;** |
| | 11. **INJUNCTIVE RELIEF** |

/ / /

1      Plaintiff, AMIR HESHMATPOUR for causes of action against Defendants ALI
2  ESMAILI, SOHRAB SEPEHRAN a/k/a SASHA SEPEHRAN, XCENTRIC
3  VENTURES, LLC, and DOES 1 through 10, inclusive, (collectively referred to as
4  "Defendants"), complains and alleges as follows:

5

6                  **INITIAL ALLEGATIONS**

7     1.    Plaintiff AMIR HESHMATPOUR (hereafter "Amir" or "Plaintiff") was
8  and at all times mentioned herein is an individual residing within the State of
9  California, County of Los Angeles, and conducting business within the State of
10  California, County of Los Angeles.

11    2.    Defendant ALI ESMAILI (hereafter "ESMAILI") is an individual
12  residing within the State of California, County of Los Angeles.

13    3.    Defendant SOHRAB SEPEHRAN a/k/a SASHA SEPEHRAN (hereafter
14  "SEPEHRAN") is an individual residing within the State of California, County of Los
15  Angeles.

16    4.    Defendant XCENTRIC VENTURES, LLC (hereafter "XCENTRIC") is
17  an Arizona limited liability company that is and was at all times relevant herein with
18  an online presence relating to consumer advocacy and business solicitation at
19  www.ripoffreport.com, which offers services in the County of Los Angeles, State of
20  California.

21    5.    Plaintiff is ignorant of the true names and capacities, whether individual,
22  corporate, associate or otherwise, of defendants DOES 1 through 10, inclusive.
23  Plaintiff is informed and believes, and thereon alleges, that each fictitious defendant
24  was in some way responsible for, participated in, or contributed to the matters and
25  things of which Plaintiff complains herein, and in some fashion has legal
26  responsibility therefore.  When the exact nature and identity of such fictitious
27  defendants' responsibility for, participation in, and contribution to the matters and

28

1 things herein alleged is ascertained by Plaintiff, Plaintiff will seek to amend this
2 Complaint and all proceedings herein to set forth the same.

3 **JURISDICTION AND VENUE**

4      6.    This is an action for copyright infringement of protected works brought
5 pursuant to the Copyright Act of 1976, as amended, 17 U.S.C. §101, et seq. This
6 Court has original jurisdiction in this matter pursuant to 28 U.S.C. §§1331 and
7 1338(a). Further, this Court has personal jurisdiction over Defendants as they reside
8 and are domiciled within the state of California, transact business in the State of
9 California, and a substantial amount of the infringing activity alleged herein occurred
10 in the State of California.

11      7.    Venue is proper in this district pursuant to 28 U.S.C. §1391(b) as
12 Defendants reside in the State of California, County of Los Angeles, their principal
13 place of business is in the State of California, County of Los Angeles, and a
14 substantial part of the events giving rise to the claims alleged herein occurred in this
15 district.

16 **INTRODUCTION**

17      8.    Plaintiff Amir operates AFH Holding & Advisory, LLC (hereafter
18 "AFH"), a business and financial advisory firm which offers solutions aimed at
19 assisting business growth to both domestic and international clients. AFH focuses on
20 capital formation, advisory and the implementation of alternative public offerings, and
21 acquisition/marketing strategies. In that capacity Amir, by and through AFH, has
22 been involved in numerous successful transactions, and has earned a reputation of
23 skill and competence within the industry.

24      9.    At some point in 2010 Defendant ESMAILI began appearing at certain
25 social and entertainment functions where Amir was present, and thus Amir began over
26 a period of time to recognize ESMAILI and to consider ESMAILI as being part of the
27 same circle within which Amir regularly socialized. Around this same time period,
28

1  Defendant ESMAILI introduced Amir to Defendant SEPEHRAN, who was also
2  appearing at various social and entertainment events frequented by Plaintiff.

3      10.    Plaintiff is informed and believes and thereon alleges Defendants
4  SEPEHRAN and ESMAILI were intentionally tracking Amir's social calendar in an
5  effort to create a "friendship" and relationship with Amir, based on said Defendants'
6  mutual desire to involve themselves with Amir and AFH's successful business
7  transactions, in the hope that the Defendants could capitalize from the same.
8  Unsuspecting of the true motives of Defendants, Amir did not question who said
9  Defendants were or why they were in attendance at various events.

10     11.    After repeated meetings at such social and entertainment events, a
11 relationship did in fact develop, particularly between Defendant ESMAILI and Amir;
12 so much so that at one point ESMAILI asked Amir for employment at AFH,
13 presumably so ESMAILI could have a firsthand look at, and education into, the deals
14 that AFH was negotiating and consummating for its clients. Ultimately AFH declined
15 to employ ESMAILI.

16     12.    Despite not being offered employment, Defendant ESMAILI persisted,
17 and eventually asked Amir to be part of an AFH pending deal. At the time, in or
18 around June or July of 2011, after inquiring into the Defendant ESMAILI's financial
19 status, Amir presented a transaction involving a security company which was being
20 considered as viable for a public offering. Defendant ESMAILI agreed to invest
21 $100,000.00 into a specific entity that would facilitate the taking of the security
22 company public, with the understanding that if the security company proves not to be
23 a sufficient target for the public offering the funds will be applied to another potential
24 target company, in a similar fashion and deal structure. In short, this business
25 structure would offer an additional level of protection for Defendant ESMAILI's
26 financial commitment, and was offered by Amir as a courtesy to Defendant, whom
27 had now established a "friendship" with Amir.

28

---

**COMPLAINT**
4

13.     Defendant ESMAILI agreed to the transaction, and as a result filled out an investor suitability questionnaire, wherein ESMAILI was required to verify his financial condition, and declare his liquidity as being sufficient to make such an investment.   A true and correct copy of said investor questionnaire is attached herewith as **EXHIBIT A**.

14.     Around this same time, Defendant SEPEHRAN expressed an interest in involvement in the same deal, or another AFH deal structure.  Based thereon at some point after the contribution made by ESMAILI, Defendant SEPEHRAN thereafter filled out an identical investor questionnaire to set forth his financial condition, and declare his liquidity as being sufficient to make such an investment.  A true and correct copy of said investor questionnaire is attached herewith as **EXHIBIT B.**

15.     On both forms, the Defendants made certain representations that Plaintiff Amir has now learned are clearly untrue, specifically with regard to the source of funds contributed to the deal, the liquidity of Defendants, and the assets and financial net worth of Defendants.  Specifically, at the time the questionnaire was prepared, Defendant ESMAILI told Amir that he owned 60 plus pieces of real estate, and that he was actively engaged in legitimate real estate transactions as his primary income source. He further stated that the funds he was contributing to the deal were his own and derived from his legitimate dealings in the real estate market.

16.     In fact, as it would later be discovered, the source of funds was not the only issue withheld or covered up by Defendant ESMAILI.  Plaintiff is now informed and believes and thereon alleges that Defendant ESMAILI is under investigation, or has been under investigation for tax evasion, and in fact that ESMAILI is a convicted felon. Moreover, Plaintiff is informed and believes and thereon alleges that ESMAILI was involved with a criminal enterprise consisting of Pakistani nationals who were arrested for real estate fraud related matters.

17.     Not knowing such information in 2011, Plaintiff Amir agreed to continue business dealings with Defendants.  On or about July 11, 2011, Defendant ESMAILI

contributed $100,000.00 toward the contemplated transaction, and in doing so executed a stock purchase agreement containing the terms of the transaction, a true and correct copy of which is attached herewith as **EXHIBIT C**. Said agreement adequately and clearly sets forth the nature of the investment and the representations of the seller, a wholly owned AFH entity authorized and eligible to engage in the transaction set forth in the agreement and herein.

18.    At some point after ESMAILI's initial contribution of funds as referenced above, it was determined that an agreement could not be reached as to the valuation of the security company originally targeted for the public offering. Thus, in an effort to keep Defendants in an AFH deal, AFH offered to use said fund in connection with a pharmaceutical company that was being taken public; this entity was later known as Emmaus Life Sciences, Inc. (hereafter "Emmaus"). Defendants agreed to their involvement in the transaction, and as such requested to be further involved in the transaction by contributing additional capital to the Emmaus deal.

19.    Specifically, on or about November 14, 2011, Defendant ESMAILI contributed an additional $400,000.00 toward the contemplated transaction, and in doing so executed another stock purchase agreement containing the terms of the transaction, a true and correct copy of which is attached herewith as **EXHIBIT D**. Said agreement adequately and clearly sets forth the nature of the investment and the representations of the seller a wholly owned AFH entity authorized and eligible to engage in the transaction set forth in the agreement and herein.

20.    Simultaneously, Defendant SEPEHRAN wanted to be involved in the Emmaus public offering deal as well, and on or about November 21, 2011, SEPEHRAN contributed $40,000.00 to the deal, and in doing so also executed a stock purchase agreement containing the terms of the transaction, a true and correct copy of which is attached herewith as **EXHIBIT E**. Said agreement adequately and clearly sets forth the nature of the investment and the representations of the seller a wholly

1 owned AFH entity authorized and eligible to engage in the transaction set forth in the
2 agreement and herein.

3      21.    Again, on or about January 9, 2012, Defendant SEPEHRAN contributed
4 additional funds to the Emmaus deal, in the same manner as above, and in doing so
5 executed another stock purchase agreement containing the terms of the transaction, a
6 true and correct copy of which is attached herewith as **EXHIBIT F**. Said agreement
7 adequately and clearly sets forth the nature of the investment and the representations
8 of the seller a wholly owned AFH entity authorized and eligible to engage in the
9 transaction set forth in the agreement and herein.

10     22.    Defendants were at all times relevant herein, and so remain, well aware
11 of the status, terms and condition of the Emmaus transaction, and at all times herein
12 and after been provided accurate and current information with respect the relevant
13 aspects of the transaction.  Plaintiff is informed and believes and thereon alleges that
14 both Defendants were and are aware that the Emmaus transaction, as with other
15 similar transactions, can take a significant amount of time and inherently involve a
16 significant amount of risk, and as such, Defendant must have been in a position to not
17 require access to the contributed funds, or returns on said funds, through the duration
18 of the transaction. The Emmaus transaction is in fact still pending.

19     23.    Despite their knowledge of the same, in or about the middle of 2012,
20 Defendant ESMAILI began making a series of demands for the return of his
21 contributed capital, despite the fact that the Emmaus deal was still proceeding.  Said
22 demands started with ESMAILI asking Amir to "repurchase" ESMAILI's shares in
23 Emmaus, of which Amir advised that such a transaction was not possible.  Such a
24 transaction was not possible because the entity in which ESMAILI purchased an
25 interest is a publically traded, publically regulated entity, the consequence of which
26 would result in a unlawful transaction between Plaintiff and ESMAILI.  Despite
27 Plaintiff's inability to repurchase said shares, Amir endeavored to assist ESMAILI

28

1 with his concern, and met with him in July of 2012. Amir advised ESMAILI to
2 contact Emmaus to determine if Emmaus would purchase said shares.

3 24. Despite Amir's assistance, the straight forward nature of the transaction
4 and the full disclosure of the terms, Plaintiff would soon learn that Defendants would
5 take other measures in order to recoup their funds ahead of the transaction. In August
6 2012, without warning, several men, dressed in dark clothes and hooded sweatshirts
7 came to the AFH offices in Beverly Hills, California and demanded money from AFH
8 in connection with Defendant ESMAILI and Emmaus. AFH immediately contacted
9 the Beverly Hills Police Department, but before the officers arrived, and before the
10 men left, Plaintiff Amir learned that at least a portion of the money contributed by
11 ESMAILI to the Emmaus deal belonged to these men, and not to ESMAILI. It was
12 further learned by Plaintiff that Defendant ESMAILI was aware of and somehow
13 connected to these individuals and their attempt to scare, intimidate and threaten Amir
14 and AFH into providing a return of funds.

15 25. Amir tried to contact ESMAILI regarding the matter, however, ESMAILI
16 refused to speak with Amir. Thus, immediately Amir contacted Defendant
17 SEPEHRAN who acknowledge awareness of the incident and further told Plaintiff
18 Amir that ESMAILI was behind the extortion attempt. Plaintiff Amir also reported
19 this incident to the Malibu Sheriff's department, the law enforcement agency having
20 jurisdiction over the location where Amir resides with his wife and two children.

21 26. Despite defendants' failed extortion attempt, Defendants were still not
22 satisfied to wait for the Emmaus deal to complete. Instead, Defendants ESMAILI and
23 SEPEHRAN, chose to engage in a vicious internet smear campaign designed to
24 cripple Amir and AFH in their business efforts. Specifically, in November 2012 Amir
25 became aware of an internet website with the URL of www.amirheshmatpour.net
26 which Plaintiff is aware that said site was created by Defendants ESMAILI and
27 SEPEHRAN, and is managed and controlled by said Defendants. Specifically,
28 Plaintiff, through its representative, spoke with the webmaster of said site, Matthew

1  Ewing, who acknowledged he was hired by ESMAILI and SEPEHRAN to create and
2  host the cite. A true and correct copy of the splash page of the website is attached
3  herewith as **EXHIBIT G**. As a result of Plaintiffs' efforts and expense, the site has
4  now been removed.

5      27. Said website contains false, slanderous statements about Plaintiff Amir
6  and his family, including statements that he is a liar, and thief, spends investor monies
7  for his own personal gain, and that he has engaged in "a romantic incest family
8  scandal" (collectively as "Defamatory Statements"). Even more concerning, upon
9  entering the website, there are pages and pages of photographs of Plaintiff's personal
10 life, family members, home, personal affects, and other private matters that, Plaintiff
11 is informed and believes, were hacked and stolen from Amir's private "instagram"
12 internet based social networking site, used only by Amir and his family members
13 (collectively as "Private Matters"). The now public display of these personal
14 photographs has put Amir and his family's safety and wellbeing in jeopardy, and has
15 made Amir's private life a public matter. Moreover, the falsities and atrocities
16 contained on even just the "splash" page of the website have caused alarm with certain
17 colleagues, business associates, partners affiliates and investors with whom Plaintiff
18 engages in regular business with, all to the financial detriment of Amir and AFH, for
19 which Plaintiff now brings the instant action for relief.

20     28. Then in December 2012 Plaintiff became aware of additional postings on
21 "The Ripoff Report," a website owned by Defendant XCENTRIC and located at the
22 URL <www.ripoffreport.com> (the "ROR Website").

23     29. The ROR Website is a forum for consumers to air legitimate complaints
24 about businesses with which they have had less than satisfactory dealings. According
25 to the ROR Website policies, the administrators may edit the posts for content,
26 however will not remove the posts regardless of falsity or divulge the identity of the
27 individual posting the "complaints."

28

1    30.    Additionally, the ROR Website offers "corporate advocacy program"
2  whereby the company can become a member and "repair their reputation" by adhering
3  to certain requirements set by Defendant XCENTRIC.  Other than this "corporate
4  advocacy program" wherein the damaged company is required to pay for an
5  'arbitration, hearing, and review" Defendant XCENTRIC touts itself as being
6  untouchable by any state or federal laws, and thus the only way to have a positing
7  removed through its "corporate advocacy program" is to, upon payment of fees, have
8  portions of the offending post "redacted."  Although the damaged company must first
9  "prevail" in the program.

10    31.    These December postings, along with the subsequent postings in January
11  and February 2013 contain various false statements about Plaintiff, as well as his wife
12  and other family members, and employees, made by Defendants ESMAILI and
13  SEPEHRAN.  Such statements have nothing to do with a business purpose, despite the
14  fact that XCENTRIC claims such is the reason behind its ROR Website.

15    32.    These false and defamatory statements made by Plaintiff is informed,
16  believes, and thereon alleges Defendants ESMAILI and SEPEHRAN include
17  accusations of theft, fraud, being a con artist, fraud, and operating a Ponzi scheme,
18  incest, and child molestation, among other things (the "Defamatory Statements").

19    33.    Plaintiff is informed, believes, and thereon alleges Defendants ESMAILI
20  and SEPEHRAN also hacked into his private Instagram account - a social networking
21  site and mobile application whereby users can post photographs for either public or
22  private viewing.   They have posted a number of these private photographs (the
23  "Works") despite not having permission to access the account.  These photographs are
24  property of Plaintiff and, as Plaintiff is the author (as defined by the Copyright Act) of
25  the images, he is the copyright holder and alone has the rights enumerated by the
26  Copyright Act, including the rights to duplicate, display, or distribute the works.

27    34.    Plaintiff is informed, believes, and thereon alleges Defendants ESMAILI
28  and SEPEHRAN have resorted to making these Defamatory Statements in an effort to

1   succeed in forcing Plaintiff to refund legitimately invested funds as past extortion
2   attempts have failed.

3       35.   Plaintiff is further informed, believes, and thereon alleges the posting of
4   the Defamatory Statements are a desperate attempt by Defendants ESMAILI and
5   SEPEHRAN to recover the funds as they borrowed the same from unsavory
6   individuals who are now demanding the return of the funds from Defendants.

7       36.   At the time of making the Defamatory Statements and disclosing the
8   Private Matters, Defendants, and each of them, knew that the Defamatory Statements
9   were false and further knew that the publication and communication of said
10  Defamatory Statements would result in injury to Plaintiff, but did so anyway with
11  conscious disregard for the derogatory and harsh effect said Defamatory Statements
12  and Private Matters would have if published upon Plaintiff, his family, friends and
13  business relations.

14      37.   Defendants acted with malice and ill-will toward Plaintiff, with the intent
15  to harm and injure Plaintiff by coercing Plaintiff to provide a return of the funds
16  contributed by Defendants, and each of them, in direct violation of the parties' stock
17  purchase agreements, as well as to be concerned for the effect such Defamatory
18  Statements and Private Matters would have upon his wife, family, friends and
19  business associates.

20      38.   The mere publication of the Defamatory Statements and Private Matters
21  to the whole world, including Plaintiff's family, friends and business associates, was
22  defamatory, unspeakable and intended by Defendants and each of them to impute that
23  Plaintiff is somehow a scam-artist and unchaste in that the Defamatory Statements and
24  Private Matters involved alleged sexually deviant incest among family members and
25  false representations about how Plaintiff uses investor funds,  such that Plaintiff's
26  family, friends and business associates would reasonably conclude to be immoral and
27  vulgar.  Defendants further intended Plaintiff to become substantially fearful of the
28  harm it would cause to Plaintiff and his relations and did cause substantial harm to

1  Plaintiff inasmuch as said third parties understood the defamatory meaning of said
2  Defamatory Statements and its applicability to Plaintiff.

3      39.    Said Defamatory Statements and Private Matters were made, published
4  and/or disclosed without privilege and with malice and ill-will as set forth above.

5      40.    The publication and disclosure of the Defamatory Statements and Private
6  Matters directly injured Plaintiff with respect to his familial, social and business
7  relationships, as well as his profession, trade or business, inasmuch as it imputed to
8  him a want of chastity, unethical and immoral behavior, which by natural consequence
9  in broadcasting such statements has caused actual damage to Plaintiff.

10
11                          **FIRST CAUSE OF ACTION**
12                **(Libel Per Se as Against ESMAILI and SEPEHRAN)**

13      41.    Plaintiff realleges and incorporates by reference each and every
14  allegation contained in Paragraphs 1 through 40 above as though fully set forth herein.

15      42.    The foregoing publication of the Defamatory Statements and Private
16  Matters by Defendants constitute libel per se.

17      43.    As a direct and proximate result of Defendants' said wrongful action,
18  Plaintiff has been damaged in an amount to be ascertained at time of time, which
19  damages are ongoing and not yet fully ascertained.  Plaintiff will seek leave of Court
20  to amend this Complaint to assert said sum when fully ascertained or in accordance
21  with proof at time of trial.

22      44.    Defendants' conduct as set forth hereinabove was done knowingly,
23  willfully, with malicious intent, and Plaintiff is thereby entitled to punitive damages in
24  an amount to be determined at time of trial.

25  / / /
26  / / /
27  / / /
28  / / /

## SECOND CAUSE OF ACTION

### (Defamation as Against Defendants Esmaili and Sepehran)

45.    Plaintiff realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 44 above as though fully set forth herein.

46.    Defendants, by and through the acts alleged herein, knowingly published the Defamatory Statements and Private Matters about Plaintiff to other parties and the public in such a way as to constitute and create a false impression and context about Plaintiff, thus injuring Plaintiff's reputation and standing in the community and among his family member and peers and causing injury to Plaintiff in his business by causing alarm among colleagues, associates, partners affiliates and investors with whom Plaintiff engages in regular business with, as well as causing Plaintiff great personal anguish, worry and concern by Defendants' threatened wrongful actions and the irreparable damage that may be caused to Plaintiff.

47.    As a direct and proximate result of Defendants' said wrongful action, Plaintiff has been damaged in an amount to be ascertained at time of time, which damages are ongoing and not yet fully ascertained.  Plaintiff will seek leave of Court to amend this Complaint to assert said sum when fully ascertained or in accordance with proof at time of trial.

48.    Defendants' conduct as set forth hereinabove was done knowingly, willfully, with malicious intent, and Plaintiff is thereby entitled to punitive damages in an amount to be determined at time of trial.

## THIRD CAUSE OF ACTION

### (Trade Libel as Against Defendants Esmaili and Sepehran)

49.    Plaintiff realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 48 above as though fully set forth herein.

50.    Plaintiff is informed and believes and thereon alleges that, in its ongoing retaliatory efforts to interfere with Plaintiff's business operations, Defendants made

1  false and defamatory statements regarding Plaintiff's services and Defendants knew
2  such statements were false at the time they were made. The statements were made
3  with malice and intent to injure Plaintiff's business and business reputation.

4      51.    As a result of such trade libel, Plaintiff has suffered injury and damage to
5  its business and goodwill in an amount to conform to proof at time of trial, but in no
6  event less than the jurisdictional minimum of this Court.

7      52.    Because actions of Defendants were committed with malice and intent to
8  injure, Plaintiff is entitled to exemplary and punitive damages in a sum appropriate to
9  punish Defendants.

10

11                        **FOURTH CAUSE OF ACTION**

12              **(Intrusion as Against Defendants Esmaili and Sepehran)**

13     53.    Plaintiff realleges and incorporates by reference each and every
14  allegation contained in Paragraphs 1 through 52 above as though fully set forth herein.

15     54.    Defendants, and each of them, maliciously and intentionally intruded into
16  Plaintiff's private affairs by, among other things, hacking, stealing and later
17  publishing Private Matters, which Plaintiff is informed and believes, were hacked and
18  stolen by Defendants from Plaintiff's private "instagram" internet based social
19  networking site, used only by Plaintiff and his family members.

20     55.    Defendants' conduct, as alleged hereinabove, constitutes an intrusion
21  upon the solitude, seclusion, private affairs, or concerns of another, in a manner that
22  would be highly offensive to a reasonable person.

23     56.    As a direct and proximate result of Defendants' said wrongful action,
24  Plaintiff has been damaged in an amount to be ascertained at time of time, which
25  damages are ongoing and not yet fully ascertained.  Plaintiff will seek leave of Court
26  to amend this Complaint to assert said sum when fully ascertained or in accordance
27  with proof at time of trial.

28

1     57.    Defendants' conduct as set forth hereinabove was done knowingly,
2  willfully, with malicious intent, and Plaintiff is thereby entitled to punitive and treble
3  damages in accordance with California law and in an amount to be determined at time
4  of trial.

### FIFTH CAUSE OF ACTION

**(Public Disclosure of Private Facts as Against Defendants Esmaili and Sepehran)**

    58.    Plaintiff realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 57 above as though fully set forth herein.

    59.    Defendants, and each of them, maliciously and intentionally intruded into Plaintiff's private affairs by, among other things, hacking, stealing and later publishing Private Matters, which Plaintiff is informed and believes, were hacked and stolen by Defendants from Plaintiff's private "instagram" internet based social networking site, used only by Plaintiff and his family members.

    60.    Defendants' public disclosure of the Defamatory Statements and Private Matters by posting the same throughout various internet websites and/or making oral publications to third parties, is and was highly offensive to Plaintiff in that it portrays Plaintiff is a false light among his family, friends and business associates.  Said Defamatory Statements and Private Matters are not newsworthy.

    61.    As a direct and proximate result of Defendants' said wrongful action, Plaintiff has been damaged in an amount to be ascertained at time of time, which damages are ongoing and not yet fully ascertained.  Plaintiff will seek leave of Court to amend this Complaint to assert said sum when fully ascertained or in accordance with proof at time of trial.

    62.    Defendants' conduct as set forth hereinabove was done knowingly, willfully, with malicious intent, and Plaintiff is thereby entitled to punitive and treble damages in accordance with California law and in an amount to be determined at time of trial.

## SIXTH CAUSE OF ACTION

### (False Light as Against Defendants Esmaili and Sepehran)

63.   Plaintiff realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 62 above as though fully set forth herein.

64.   Defendants, and each of them, maliciously and intentionally intruded into Plaintiff's private affairs by, among other things, hacking, stealing and later publishing Private Matters, which Plaintiff is informed and believes, were hacked and stolen by Defendants from Plaintiff's private "instagram" internet based social networking site, used only by Plaintiff and his family members.

65.   Defendants' public disclosure of the Defamatory Statements and Private Matters by posting the same throughout various internet websites and/or making oral publications to third parties, is and was highly offensive to Plaintiff in that it portrays Plaintiff is a false light among his family, friends and business associates.   The disclosure of said Defamatory Statements and Private Matters were at all times an unfair and inaccurate depiction of Plaintiff in the public eye.

66.   As a direct and proximate result of Defendants' said wrongful action, Plaintiff has been damaged in an amount to be ascertained at time of time, which damages are ongoing and not yet fully ascertained.   Plaintiff will seek leave of Court to amend this Complaint to assert said sum when fully ascertained or in accordance with proof at time of trial.

67.   Defendants' conduct as set forth hereinabove was done knowingly, willfully, with malicious intent, and Plaintiff is thereby entitled to punitive and treble damages in accordance with California law and in an amount to be determined at time of trial.

/ / /

/ / /

/ / /

/ / /

1

## SEVENTH CAUSE OF ACTION

2

### (Civil Extortion as Against Defendants Esmaili and Sepehran)

3      68.    Plaintiff realleges and incorporates by reference each and every
4  allegation contained in Paragraphs 1 through 67 above as though fully set forth herein.

5      69.    In August 2012, without warning, several men, dressed in dark clothes
6  and hooded sweatshirts came to the AFH offices in Beverly Hills, California and
7  demanded money from Plaintiff in connection with Defendant ESMAILI and
8  Emmaus. Plaintiff immediately contacted the Beverly Hills Police Department, but
9  before the officers arrived, and before the men left, Plaintiff learned that at least a
10  portion of the money contributed by ESMAILI to the Emmaus deal belonged to these
11  men, and not to ESMAILI. It was further learned by Plaintiff that Defendant
12  ESMAILI was aware of and somehow connected to these individuals and their attempt
13  to scare, intimidate and threaten Amir and AFH into providing a return of funds.

14      70.    The foregoing wrongful acts constitute civil extortion inasmuch as
15  Defendants, and each of them, threatened to continue publishing the Defamatory
16  Statements and Private Matters to the public thereby imputing Plaintiff as unchaste,
17  immoral and vulgar if Plaintiff did not provide the return of the funds contributed by
18  Defendants and each of them, which Defendants were not legally entitled.

19      71.    As a direct and proximate result of Defendants' said wrongful action,
20  Plaintiff has been damaged in an amount to be ascertained at time of time, which
21  damages are ongoing and not yet fully ascertained. Plaintiff will seek leave of Court
22  to amend this Complaint to assert said sum when fully ascertained or in accordance
23  with proof at time of trial.

24      72.    Defendants' conduct as set forth hereinabove was done knowingly,
25  willfully, with malicious intent, and Plaintiff is thereby entitled to punitive and treble
26  damages in accordance with California law and in an amount to be determined at time
27  of trial.

28  / / /

## EIGHTH CAUSE OF ACTION

### (Tortious Interference with Business Advantage as Against
### Defendants Esmaili and Sepehran)

73. Plaintiff realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 72 above as though fully set forth herein.

74. Having been involved in numerous successful transactions, Plaintiff enjoyed an industry-wide reputation of skill and competence among his family, friends, and business associates.

75. Defendants, and each of the, were at all time fully aware and had direct knowledge of the favorable relationship between Plaintiff and certain business associates of his, particularly since Defendants were regularly appearing at various social and entertainment events frequented by Plaintiff.

76. Plaintiff is informed and believes that in an effort to intentionally interfere with the business relationships between Plaintiff and certain colleagues, business associates, partners affiliates and investors with whom Plaintiff engages in regular business with, Defendants undertook the efforts detailed hereinabove in an attempt to injury and harm Plaintiff's familial, social, and business relationships.

77. As a direct and proximate result of Defendants' said wrongful action, Plaintiff has been damaged in an amount to be ascertained at time of time, which damages are ongoing and not yet fully ascertained. Plaintiff will seek leave of Court to amend this Complaint to assert said sum when fully ascertained or in accordance with proof at time of trial.

78. Furthermore, Defendant's conduct was performed with such conscious disregard of Plaintiff's rights, such as to constitute malice and oppression, thereby rendering Defendant liable for punitive damages in an amount to be proven at time of trial.

/ / /

/ / /

1

## NINTH CAUSE OF ACTION

2

### (Common Law Copyright Infringement - Against Defendants Esmaili and

3

### Sepehran)

4      79.   Plaintiff realleges and incorporates by reference each and every

5  allegation contained in Paragraphs 1 through 78 above as though fully set forth herein

6      80.   Plaintiff is the legal owner of the Works pursuant to both basic common

7  law principles in Copyright.

8      81.   By means of the actions alleged herein, Defendants have infringed and

9  continue to infringe Plaintiff's copyrights in and to the Works by, among other things,

10  reproducing, displaying and/or distributing the Works and/or derivatives.

11      82.   As a result of Defendants infringement, actual consumer confusion has

12  already occurred by the viewing public who believe Defendants works to be

13  authorized by, licensed by, approved of and/or affiliated with Plaintiff. At no time did

14  Defendants have the authorization, legal right, or consent to engage in said activities.

15      83.   By means of the actions complained of herein, Defendants have

16  improperly appropriated Plaintiff's non-functional creative expression.

17      84.   By means of the actions complained of herein, Defendants have willfully

18  and intentionally infringed and continue to infringe Plaintiff's copyrights in and

19  relating to the Subject Works.

20      85.   Plaintiff has suffered irreparable harm and damage due to Defendants'

21  actions. Further, irreparable injury to Plaintiff is imminent as a result of Defendants'

22  conduct, so that Plaintiff is without an adequate remedy at law.

23      86.   Plaintiff is likely to prevail in its claims of copyright infringement against

24  Defendants and is thereby entitled to an injunction restraining Defendants, their

25  distributors, officers, directors, agents, employees, representatives and all persons

26  acting in concert with them, from engaging in such further violations of the copyright

27  laws.

28

87.    Plaintiff is further entitled to recover the damages, including attorneys fees, it has sustained as well as Defendants' gains, profits and advantages obtained as a result of the infringing acts as alleged herein, and/or statutory damage.

## TENTH CAUSE OF ACTION

### (Contributory Copyright Infringement - Against Defendant XCentric)

88.    Plaintiff realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 87 above as though fully set forth herein

89.    Plaintiff is informed, believes and thereupon alleges that by means of the actions complained of herein, XCENTRIC and DOES 1-2, in its capacity as owner(s) and operator(s) of the ROR Website, has induced, caused or materially contributed to the infringing conduct of others through the reproduction, display, and distribution of the Works to the general public.

90.    Defendant XCENTRIC acknowledges that it hosts content on its ROR Website and in doing so will under no circumstances remove the content even in circumstances such as that stated herein wherein the hosting of said images, taken and owned by Plaintiff HESHMATPOUR.

91.    In engaging in such conduct, and in acting in the capacity has alleged herein, Defendant XCENTRIC is has committed and continues to commit contributory copyright infringement, and in doing so, is not protected by the Communications Decency Act, behind which said Defendant claims it is not responsible for the content of its ROR website, nor the consequences of its hosting the same.

92.    Plaintiff has suffered irreparable harm due to Defendant's contributory copyright infringement, and further irreparable injury to Plaintiff is imminent as a result of Defendants' conduct, so that Plaintiff is without an adequate remedy at law.

93.    As a result of this contributory copyright infringement, Plaintiff is entitled to an injunction restraining XCENTRIC and DOES 1-2, their officers,

1  directors, agents, representatives, employees, and all persons acting in concert with
2  them, from engaging in further such acts in violation of the copyright laws.

4                    **ELEVENTH CAUSE OF ACTION**
5                 **(Injunctive Relief - Against Defendant XCentric)**

6      94.    Plaintiff realleges and incorporates by reference each and every
7  allegation contained in Paragraphs 1 through 93 above as though fully set forth herein.

8      95.    Defendant claims to be a forum for consumers to air legitimate
9  complaints and concerns about their dealings with businesses to the public.

10     96.    In order to file a report or rebuttal, a user must first register and create an
11 account with the ROR Website.  In doing so, a user provides the basic contact
12 information requested by Defendant, for example:  name, address, and phone number.
13 This information is then used by Defendant in order to "follow-up and possible help
14 with your rip-off situation" because Defendant "cannot pursue prosecution of
15 unscrupulous companies and individuals if we cannot contact you."  A true and
16 correct copy of the registration form is attached hereto as **EXHIBIT H**.

17     97.    Defendant also states that, while it does not censor the posts on its
18 website, it will "delete any profanity."  Despite the forgoing, Defendant does edit
19 postings to remove content at its own discretion.  Thus, in reviewing each and every
20 posts uploaded to its ROR Website, Defendant XCENTRIC is making its own
21 determination on which if any matters are profane, and in doing so, applies its own
22 standards to make such determination.  A true and correct copy of this policy is
23 attached hereto as **EXHIBIT I**.

24     98.    Further, Defendant states that even if content is found to be defamatory
25 or unlawful, it will not remove the posting from its site.  Defendant will, however
26 redact the post if the business submits to its "arbitration process," pays the fees to
27 Defendants, and the arbitrator finds for the complainant.  A true and correct copy of
28 this policy is attached hereto as **EXHIBIT J**.

99. Based on the foregoing, Plaintiff is informed, believes, and thereon alleges that Defendant not only actively encourages and solicits submissions from individuals which are tortious and unlawful, but also reviews each post submitted to ensure the content meets its salacious and inflammatory requirements before posting on the ROR Website. Defendant then encourages the businesses to rebut the allegations, for a fee, effectively forcing them into submitting their contact information so that Defendant can then contact the business and coerce them into agreeing to pay a significant fee for an "arbitration" and membership in Defendant's "corporate advocacy program"

100. In doing so, the damaged must now become a "member" and "repair their reputation" by adhering to certain requirements set by Defendant XCENTRIC and imposed upon the business, whether or not the reports are false, defamatory, or unlawful, including in the instant matter, such "reports" that infringe on the copyright ownership of the aggrieved party. At such time as Defendant deems the contact to be false, defamatory, or unlawful, it will then redact the post in order to remove the offensive content. Again, this is the only means of redress against an unlawful and damaging post, and can only be done pay remission of a fee to Defendant XCENTRIC.

101. Plaintiff is informed, believes, and thereon alleges Defendant is not only acting as a pseudo-regulatory agency, imposing its own rules and regulations for what is a "good business" under the guise of "consumer advocacy" but has also found a way to abuse the immunity of the Communications Decency Act §230 for its own commercial purposes.

102. Defendant is skirting actual laws and established legal tenets by hiding behind the Communications Decency Act and claiming it is not responsible for libelous statements made on its website, despite the fact it solicits and encourages such statements and combs through the submitted complaints to find the most outrageous ones, allowing such statements to be published in order to entice

businesses to rebut the allegations, then contacting the business in order to convince them that they only way to avoid further problems of this kind is to pay for an arbitration and membership in this "advocacy program" to obtain the Ripoff Report seal of approval.

103.   In light of Defendant XCENTRIC's role, Plaintiff seeks preliminary and permanent injunctive relief preventing Defendant from allowing any further postings on its website which are similar in nature with respect to Plaintiff, as well as ordering Defendant to remove those false and defamatory postings already submitted.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment in his favor and against Defendants as follows:

1.   For damages to be proven at time of trial;

2.   For exemplary, punitive and treble damages as permitted by law;

3.   For interest thereon at the maximum legal rate;

4.   For costs of suit, including reasonable attorneys' fees;

5.   For an order enjoining Defendants ESMAILI and SEPEHRAN, and each of them, from further publications of any Defamatory Statements and/or disclosure of Private Matters, including an order requiring Defendants from publishing additional websites of their own, the purpose of which is to host similar damaging content.

6.   That the Defendants be held to have infringed Plaintiff's copyrights in the Works;

7.   For injunctive relief, as provided in 17 U.S.C. §502, namely for preliminary and permanent injunctive relief preventing Defendants, their distributors, officers, agents, servants, employees and representatives, and all those persons acting or attempting to act in concert or participation with them, from directly or indirectly making, displaying, delivering, distributing, selling, transferring, copying, imitating,

advertising, and/or marketing unauthorized versions of the Subject Works, or substantially similar variations thereon or derivative works thereof;

8.   For actual damages according to proof, and for any profits of Defendants ESMAILI and SEPEHRAN attributable to infringement of Plaintiff's copyrights;

9.   For statutory damages in lieu of actual damages where appropriate, as provided for in 17 U.S.C. § 504;

10.  For Plaintiff's attorneys' fees and costs of this action, as provided for in 17 U.S.C. § 504;

11.  For preliminary and permanent injunctive relief preventing Defendant XCENTRIC VENTURES, LLC from allowing any further postings on its website which are similar in nature with respect to Plaintiff, as well as ordering Defendant to remove those false and defamatory postings already submitted

12.  For such further and additional relief as the Court may deem just and proper, including pre-and post-judgment interest.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of all issues triable by a jury.

DATED:  March 6, 2013                    **BEITCHMAN & ZEKIAN, P.C.**

David P. Beitchman,
Attorneys for Plaintiff
AMIR HESHMATPOUR

# EXHIBIT A

Please complete this questionnaire as thoroughly as possible and sign, date and return a copy to the office of the Company at c/o Emmaus Holdings, Inc., 20725 S. Western Ave., Ste. 136, Torrance, CA 90501-1884. In case of insufficient space, please use the reverse side to assure that complete answers are submitted.

**Note: Any term capitalized and not defined herein shall have the meaning set forth in the Subscription Agreement between the Investor and the Company.**

Instructions:

Individual Investors should complete numbers 1-8 and 10 below. Corporations, Partnerships, Trusts and Limited Liability Companies should complete numbers 1, 9 and 10 below. Each Investor must complete and execute the signature page to this questionnaire that is applicable to such Investor.

Please print or type:

1. PERSONAL

Name __Ali Esmaili__
(Exact name as it should appear on stock certificate.)

Residential or Principal Business Address __5178 Otis Ave__

__Tarzana CA 91356__

Telephone Number __818-633-6777__

Soc. Sec. Or Tax Identification No. _____ **REDACTED**

Date of Birth __7-17-83__ Citizenship __IRAN__

2. BUSINESS

Occupation __Self Employed__

Name of Employer _____

Position/Title _____

Description of Responsibilities _____

_____

Business Address _____

_____

Business Telephone Number _____

Person or Persons to be contacted at Place of Employment _____ _____

_____

Mail to be sent to:    Home  ✓           Office _____

Prior employment if current employment less than five years:

Name of employer _____

Position _____

Description of Responsibilities _____

_____

Number of years employed _____

3. RESIDENCE

In which state do you currently

(a)   Maintain your primary residence:    _CA_ _____
(b)   Maintain secondary residence, if any: _____
(c)   Vote: _____
(d)   File income tax returns: ____ _CA_ _____
(e)   Maintain a driver's license: ____ _CA_ _____

4. NET WORTH

Will your net worth as of the date you purchase the securities offered, together with the net worth of your spouse, be in excess of $1,000,000?

Yes ✓   No _____   If not, please specify amount _____

The above net worth takes into account my current assets and other assets diminished by my current liabilities and other liabilities (excluding debt obligations on the principal residence that do not exceed the value of such residence) including contingent liabilities, such as threatened or pending lawsuits and proceedings.

All assets included represent either real estate (excluding the principal residence), shares of stock or other securities or other personal property to which legal and equitable title are solely in my name or represent my proportionate interest therein.

All values are taken at the lower of cost or current market value.

5. INCOME

    (a)    Do you reasonably expect <u>either</u> your own income from all sources during the current year to exceed \$200,000 <u>or</u> the joint income of you and your spouse (if married) from all sources during the current year to exceed \$300,000?

    Yes ___✓___    No _____    If not, please specify amount _____

    (b) What percentage of your income as shown above is anticipated to be derived from sources other than salary? __0_____

    (c) Was <u>either</u> your yearly income from all sources during each of the last two years in excess of \$200,000 <u>or</u> the joint income of you and your spouse (if married) from all sources during each of such years in excess of \$300,000?

    Yes ___✓___    No _____    If not, please specify amount for:

                             Last Year: _____
                             Year Before Last: _____

    (d)    Are you aware that the proposed offering will involve nonmarketable, nontransferable securities requiring your capital investment to be maintained for an indefinite period of time?

    Yes ___✓___    No _____

6.    Please indicate the highest academic degree held by you.

    High School ☐    College ☑    Other (Specify) _____

7.    Please provide in the space below any additional information which would evidence that you have sufficient knowledge and experience in financial and business matters so that you are capable of evaluating the merits and risks of investing in nontransferable, restricted securities.

_____

_____

_____

8.    In evaluating the merits and risks of this investment, do you intend to rely upon the advice of any other person?

Yes _____            No _____ ✓

(a)   If "Yes," please identify such person and indicate his business address and telephone number.

Name _____

Business Address _____

_____

Telephone Number _____

(b)   If "No", please indicate whether you believe you have sufficient knowledge and experience in financial and business matters generally to be capable of evaluating the merits and risks of this investment.

Yes _____ ✓            No _____

9.   Additional Information for investment by a Corporation, LLC, Partnership or Trust:

(a)   Name of organization or entity (as should appear on stock certificate):

_____

_____

(b)   Mailing Address: _____

_____

(c)   Telephone: ( __ ) _____

(d)   Send communications to the attention of: _____

_____

(e)   Date of organization: _____

(f)   State of organization: _____

(g)   Tax Identification No.: _____

(h)   Form of Organization:

LLC _____            Partnership _____

Corporation _____     Other (specify)_____

(i)     Number of Shareholders, Partners or Members_____

(j)     If a corporation, the organization has elected to be taxed as a small business corporation for federal income tax purposes under the provisions of Subchapter S of the Internal Revenue Code of 1986.

        Yes _____          No _____

(k)     The organization is actively engaged in the conduct of a trade or business:

        Yes _____          No _____

(l)     Describe purpose of formation or principal trade or business activity:

_____

_____

_____

(m)     Was such entity formed solely for the purpose of purchasing the Shares:

        Yes _____          No _____

(n)     If a limited liability company, it has elected to be taxed as a partnership for federal income tax purposes:

        Yes _____          No _____

(o)     Such entity has total assets in excess of $5,000,000:

        Yes _____          No _____

(p)     Please provide the name(s), title(s) and contact information of the person(s) making the investment on behalf of the entity:

        Name: _____

        Title: _____

        Address: _____

        Phone Number: _____

(q)   Is the entity a bank, savings and loan association, broker/dealer, insurance company, investment company, pension plan, or other entity defined in Rule 501(a)(1) of Regulation D as promulgated under the Securities Act of 1933 by the Securities and Exchange Commission:

Yes _____     No _____

(r)   Is the entity a trust, and the trustee is a bank, savings and loan association, or other institutional investor as defined in Rule 501(a)(1) of Regulation D as promulgated under the Securities Act of 1933 by the Securities and Exchange Commission:

Yes _____     No _____

(s)   Is the entity a private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940:

Yes _____     No _____

(t)   Is the entity a trust, and the grantor (i) has the power to revoke the trust at any time and regain title to the trust assets; and (ii) meets the requirements of items (a) (b), or (c) above:

Yes _____     No _____

(u)   Is the entity a tax-exempt organization described in Section 501(c) (3) of the Internal Revenue Code, or a corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the Shares with total assets in excess of $5,000,000:

Yes _____     No _____

(v)   The investor is a trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Purchased Shares, whose purchase is directed by a person who has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of an investment in the Shares:

Yes _____     No _____

10.   AFFILIATION

If you have a pre-existing relationship with the Company, any of its officers, directors or controlling persons or any of its affiliates, please describe the nature and duration of such relationship.

Friends _____
_____
_____
_____

_____

_____

## 11. FINRA MEMBERS

Indicate below whether you are a "member", a "person associated with a member," or an "affiliate" of a "member".

Yes _____        No_____ ✓ _____

If you answered "Yes" above, identify the FINRA "member" and describe the relationship with the FINRA "member".

_____

_____

_____

_____

## 12. BENEFICIAL OWNERSHIP

Please state the total number of shares of Equity Securities (if more than one class, please so specify) of the Company or any of its subsidiaries Beneficially Owned by you.

|  | Common Stock | | Other Class (Specify) | |
|---|---|---|---|---|
|  | Owned | Right to Acquire within 60 days | Owned | Right to Acquire within 60 days |
| (a) Total number of shares Beneficially Owned: | 28,000 | _____ | _____ | _____ |
| Of such shares, please indicate: |  |  |  |  |
| Amount in your individual name: | 28,000 | _____ | _____ | _____ |
| Jointly by you and someone else: | _____ | _____ | _____ | _____ |
| As custodian: | _____ | _____ | _____ | _____ |

As trustee: _____ _____ _____ _____

In the name of any
corporation, orga-
nization, trust or
other entity in
which you have a 10%
interest or more: _____ _____ _____ _____

(b) Of such total
number of shares
Owned Beneficially:

Amount as to which
you have sole
voting power: *28,000* _____ _____ _____

Amount as to which
you have shared
voting power: _____ _____ _____ _____

Amount as to which
you have sole in-
vestment power: _____ _____ _____ _____

Amount as to which
you have shared
investment power: _____ _____ _____ _____

(1) Options and Rights to Acquire Securities.

(a) Please state whether you have the right to acquire any securities of the Company, through the exercise of stock options, warrants or otherwise. Include any shares which you have the right to acquire by contract; pursuant to the power to revoke a trust or other similar arrangement; or pursuant to the automatic termination of a trust, or similar event.

YES _____ NO ✓

If yes, please provide the following information:

| Date Option Granted | Number of Shares | Date Exercisable | Average per Share Exercisable Price | Expiration Date |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |

_____    _____    _____    _____    _____

_____    _____    _____    _____    _____

(2)   Disclaimer of Beneficial Ownership.

Please state the number of shares (if any) in which you have an ownership interest, with respect to which you disclaim Beneficial Ownership and why. In addition, please indicate the name of the person or persons who should be shown as the Beneficial Owner(s) of the shares in question:

_____   None   _____

_____

_____

## SIGNATURE PAGE FOR
## INDIVIDUALS AND TRUSTS

IN WITNESS WHEREOF, the undersigned hereby represents that all of the above information is true and correct in all material respects and the undersigned recognizes that the Company and its counsel are relying on the truth and accuracy of such information in reliance on the exemption contained in Section 4(2) of the Securities Act of 1933, as amended, and Regulation D promulgated thereunder. The undersigned agrees to notify the Company promptly of any changes in the foregoing information which may occur prior to the investment.

Investment Amount: $ 100K

The Shares will be owned, and should be shown on the Company records, as follows (please check box):

[✓] A single person

[ ] Husband and wife, as community property

[ ] Joint tenants with right of survivorship (both parties must sign)

[ ] Tenants-in-Common (all parties must sign)

[ ] Trust (trustee must sign as trustee and indicate name of trust and date of trust document; trustee must also provide a copy of trust document)

[ ] Other (explain, signature as required)

Executed this 21 day of June, 2011

_____
(Signature)

Ali Esmaili

_____
(Please Print Name of Individual or Trust and Date of Trust if Applicable)


_____
(Signature)

_____
(Please Print Name of Individual or Trust and Date of Trust if Applicable)

# EXHIBIT B

Please complete this questionnaire as thoroughly as possible and sign, date and return a copy to the office of the Company at c/o AFH Holding & Advisory, LLC, 9595 Wilshire Boulevard, Suite 700, Beverly Hills, CA 90212. In case of insufficient space, please use the reverse side to assure that complete answers are submitted.

**Note: Any term capitalized and not defined herein shall have the meaning set forth in the Subscription Agreement between the Investor and the Company.**

Instructions:

Individual Investors should complete numbers 1-8 and 10 below. Corporations, Partnerships, Trusts and Limited Liability Companies should complete numbers 1, 9 and 10 below. Each Investor must complete and execute the signature page to this questionnaire that is applicable to such Investor.

Please print or type:

1. PERSONAL

Name  Sohrab Sepehran
　　　　(Exact name as it should appear on stock certificate.)

Residential or Principal Business Address  6601 Bianca Ave

 Lake Balboa, CA 91406

Telephone Number  (818) 424-7274

Soc. Sec. Or Tax Identification No.  ▓▓▓▓▓▓ (REDACTED)

Date of Birth  06-11-1986 Citizenship United States

2. BUSINESS

Occupation  Sales

Name of Employer  Falcon Armor & Rebuilders

Position/Title  President

Description of Responsibilities _____

_____

Business Address  20969 Ventura Blvd. Suite 213

　　　　　　　　　Woodland Hills, CA 91364

Business Telephone Number (866) 305-8615 X1 _____

Person or Persons to be contacted at Place of Employment _____

_____

Mail to be sent to:     Home  X           Office _____

Prior employment if current employment less than five years:

   Name of employer AT&T _____

   Position Store Manager _____

   Description of Responsibilities _____

   _____

   Number of years employed 4 _____

## 3. RESIDENCE

In which state do you currently

   (a)   Maintain your primary residence: CA _____
   (b)   Maintain secondary residence, if any: _____
   (c)   Vote: _____
   (d)   File income tax returns: CA _____
   (e)   Maintain a driver's license: CA _____

## 4. NET WORTH

Will your net worth as of the date you purchase the securities offered, together with the net worth of your spouse, be in excess of $1,000,000?

   Yes  X      No _____    If not, please specify amount _____

   The above net worth takes into account my current assets and other assets diminished by my current liabilities and other liabilities (excluding debt obligations on the principal residence that do not exceed the value of such residence) including contingent liabilities, such as threatened or pending lawsuits and proceedings.

   All assets included represent either real estate (excluding the principal residence), shares of stock or other securities or other personal property to which legal and equitable title are solely in my name or represent my proportionate interest therein.

All values are taken at the lower of cost or current market value.

## 5. INCOME

(a)     Do you reasonably expect either your own income from all sources during the current year to exceed $200,000 or the joint income of you and your spouse (if married) from all sources during the current year to exceed $300,000?

Yes X     No _____     If not, please specify amount _____

(b) What percentage of your income as shown above is anticipated to be derived from sources other than salary? 15% _____

(c) Was either your yearly income from all sources during each of the last two years in excess of $200,000 or the joint income of you and your spouse (if married) from all sources during each of such years in excess of $300,000?

Yes X     No _____     If not, please specify amount for:

Last Year: _____
Year Before Last: _____

(d)     Are you aware that the proposed offering will involve nonmarketable, nontransferable securities requiring your capital investment to be maintained for an indefinite period of time?

Yes X     No _____

6.     Please indicate the highest academic degree held by you.

High School [____]     College [X]     Other (Specify) _____

7.     Please provide in the space below any additional information which would evidence that you have sufficient knowledge and experience in financial and business matters so that you are capable of evaluating the merits and risks of investing in nontransferable, restricted securities.

_____

_____

_____

8.     In evaluating the merits and risks of this investment, do you intend to rely upon the advice of any other person?

Yes _____          No   X____

(a)    If "Yes," please identify such person and indicate his business address and telephone number.

Name _____

Business Address _____

_____

Telephone Number _____

(b)    If "No", please indicate whether you believe you have sufficient knowledge and experience in financial and business matters generally to be capable of evaluating the merits and risks of this investment.

Yes   X___          No   _____

9.    Additional Information for investment by a Corporation, LLC, Partnership or Trust:

(a)    Name of organization or entity (as should appear on stock certificate).

_____

_____

(b)    Mailing Address:_____

_____

(c)    Telephone: ( ___)_____

(d)    Send communications to the attention of: _____

_____

(e)    Date of organization: _____

(f)    State of organization: _____

(g)    Tax Identification No.: _____

(h)    Form of Organization:

LLC _____      Partnership _____
Corporation _____      Other (specify)_____

(i)    Number of Shareholders, Partners or Members_____

(j)    If a corporation, the organization has elected to be taxed as a small business corporation for federal income tax purposes under the provisions of Subchapter S of the Internal Revenue Code of 1986.

        Yes _____      No _____

(k)    The organization is actively engaged in the conduct of a trade or business:

        Yes _____      No _____

(l)    Describe purpose of formation or principal trade or business activity:

_____

_____

_____

(m)    Was such entity formed solely for the purpose of purchasing the Shares:

        Yes _____      No _____

(n)    If a limited liability company, it has elected to be taxed as a partnership for federal income tax purposes:

        Yes _____      No _____

(o)    Such entity has total assets in excess of $5,000,000:

        Yes _____      No _____

(p)    Please provide the name(s), title(s) and contact information of the person(s) making the investment on behalf of the entity:

Name: _____

Title: _____

Address: _____

Phone Number: _____

(q)   Is the entity a bank, savings and loan association, broker/dealer, insurance company, investment company, pension plan, or other entity defined in Rule 501(a)(1) of Regulation D as promulgated under the Securities Act of 1933 by the Securities and Exchange Commission:

Yes _____         No _____

(r)   Is the entity a trust, and the trustee is a bank, savings and loan association, or other institutional investor as defined in Rule 501(a)(1) of Regulation D as promulgated under the Securities Act of 1933 by the Securities and Exchange Commission:

Yes _____         No _____

(s)   Is the entity a private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940:

Yes _____         No _____

(t)   Is the entity a trust, and the grantor (i) has the power to revoke the trust at any time and regain title to the trust assets; and (ii) meets the requirements of items (a) (b), or (c) above:

Yes _____         No _____

(u)   Is the entity a tax-exempt organization described in Section 501(c) (3) of the Internal Revenue Code, or a corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the Shares with total assets in excess of $5,000,000:

Yes _____         No _____

(v)   The investor is a trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Purchased Shares, whose purchase is directed by a person who has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of an investment in the Shares:

Yes _____         No _____

10.   AFFILIATION

If you have a pre-existing relationship with the Company, any of its officers, directors or controlling persons or any of its affiliates, please describe the nature and duration of such relationship.

NA
_____
_____

_____

_____

_____

_____

## 11. FINRA MEMBERS

Indicate below whether you are a "member", a "person associated with a member," or an "affiliate" of a "member".

Yes _____     No  x  _____

If you answered "Yes" above, identify the FINRA "member" and describe the relationship with the FINRA "member".

_____

_____

_____

_____

_____

## 12. BENEFICIAL OWNERSHIP

Please state the total number of shares of Equity Securities (if more than one class, please so specify) of the Company or any of its subsidiaries Beneficially Owned by you.

|  | Common Stock | | Other Class (Specify) | |
|---|---|---|---|---|
|  | Owned | Right to Acquire within 60 days | Owned | Right to Acquire within 60 days |
| (a) Total number of shares Beneficially Owned: | 28,000 | | | |
| Of such shares, please indicate: | | | | |
| Amount in your individual name: | 28,000 | | | |
| Jointly by you and someone else: | | | | |

As custodian: _____  _____  _____  _____

As trustee: _____  _____  _____  _____

In the name of any
corporation, orga-
nization, trust or
other entity in
which you have a 10%
interest or more: _____  _____  _____  _____

(b)  Of such total
     number of shares
     Owned Beneficially:

Amount as to which
you have sole
voting power:          28,000    _____  _____  _____

Amount as to which
you have shared
voting power:          _____  _____  _____  _____

Amount as to which
you have sole in-
vestment power:        28,000    _____  _____  _____

Amount as to which
you have shared
investment power:      _____  _____  _____  _____

(1)  Options and Rights to Acquire Securities.

    (a)  Please state whether you have the right to acquire any securities of the
Company, through the exercise of stock options, warrants or otherwise.
Include any shares which you have the right to acquire by contract;
pursuant to the power to revoke a trust or other similar arrangement; or
pursuant to the automatic termination of a trust, or similar event.

    YES _____    NO __X__

    If yes, please provide the following information:

| Date Option Granted | Number of Shares | Date Exercisable | Average per Share Exercisable Price | Expiration Date |
|---|---|---|---|---|

(2)  Disclaimer of Beneficial Ownership.

Please state the number of shares (if any) in which you have an ownership interest, with respect to which you disclaim Beneficial Ownership and why. In addition, please indicate the name of the person or persons who should be shown as the Beneficial Owner(s) of the shares in question:

NA

## SIGNATURE PAGE FOR
## INDIVIDUALS AND TRUSTS

IN WITNESS WHEREOF, the undersigned hereby represents that all of the above information is true and correct in all material respects and the undersigned recognizes that the Company and its counsel are relying on the truth and accuracy of such information in reliance on the exemption contained in Section 4(2) of the Securities Act of 1933, as amended, and Regulation D promulgated thereunder. The undersigned agrees to notify the Company promptly of any changes in the foregoing information which may occur prior to the investment.

Investment Amount: $ _60000_

The Shares will be owned, and should be shown on the Company records, as follows (please check box):

[X]   A single person

[ ]   Husband and wife, as community property

[ ]   Joint tenants with right of survivorship (both parties must sign)

[ ]   Tenants-in-Common (all parties must sign)

[ ]   Trust (trustee must sign as trustee and indicate name of trust and date of trust document; trustee must also provide a copy of trust document)

[ ]   Other (explain, signature as required)

Executed this _____ day of _____

_____
(Signature)

_SOHRAB SEPEHRAV_
(Please Print Name of Individual or Trust and Date of Trust if Applicable)

_____
(Signature)

_____
(Please Print Name of Individual or Trust and Date of Trust if Applicable)

## SIGNATURE PAGE FOR
## CORPORATIONS AND PARTNERSHIPS

IN WITNESS WHEREOF, the undersigned hereby represents that all of the above information is true and correct in all material respects and the undersigned recognizes that the Company and its counsel are relying on the truth and accuracy of such information in reliance on the exemption contained in Section 4(2) of the Securities Act of 1933, as amended, and Regulation D promulgated thereunder. The undersigned agrees to notify the Company promptly of any changes in the foregoing information which may occur prior to the investment.

Investment Amount: $_____

[ ]   Corporation (signature of authorized officer(s) required; please provide certified resolution authorizing investment)

[ ]   Partnership (signature of all general partners required by partnership agreement; partnerships must provide copy of partnership agreement)

Executed this _____ day of _____, 2011

_KOHRAB SCAEHLAN_
(Please Print Name of Entity)

By: _____

_____
(Name)

_____
(Title)

By: _____

_____
(Name)

_____
(Title)

# EXHIBIT C



### STOCK PURCHASE AGREEMENT

AGREEMENT dated July 11, 2011, by and among Griffin Ventures Ltd. ("Griffin" or "Seller"), and the investor listed on Schedule A hereto (the "Buyer"). Buyer and Seller are sometimes hereinafter collectively referred to as the "Parties".

WHEREAS, Seller is the legal and beneficial owners of an aggregate of Twenty Eight Thousand (28,000) shares (the "Securities") of common stock, par value $0.001 per share (the "Common Stock"), of Emmaus Holdings, Inc., (formerly AFH Acquisition IV, Inc.) a Delaware corporation (the "Company"); and

WHEREAS, for good and valuable consideration, Seller desires to transfer and sell to Buyer all right, title and interest in the Securities and Buyer desires to purchase all such right, title and interest in the Securities (the "Sale") in the amounts set forth in Schedule A hereto;

NOW THEREFORE, in consideration of the mutual promises herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.  **Sale of Securities.**

    (a)     Securities to be Acquired. At the Closing, and upon the terms and subject to the conditions of this Agreement, and upon the representations, warranties and covenants herein made, Seller shall transfer and sell to Buyer, and Buyer agrees to purchase from the Seller, the Securities set forth on Schedule A hereto, for the Purchase Price hereinafter set forth.

    (b)     Purchase Price. Upon the terms and subject to the conditions set forth in this Agreement, for the aggregate sum of One Hundred Thousand Dollars ($100,000) (the "Purchase Price"), or $3.5714 per share of Common Stock (the "Per Share Price"), in immediately available funds by check or wire transfer to "AFH Holding & Advisory, LLC" effective as of the date first written above, Seller hereby sell, transfer, assign and convey to Buyer, and Buyer hereby purchases from Seller, the Securities.

2.  **Representations and Warranties of Buyer.** The Buyer hereby represents and warrants to each Seller, which representations and warranties shall survive the Closing, the following:

    (a)     Buyer has all requisite power and authority to execute, deliver and perform under this Agreement and the other agreements, certificates and instruments to be executed by Buyer in connection with or pursuant to this Agreement. Upon execution and delivery by Buyer at the Closing, this Agreement is a legal, valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, fraudulent conveyance or similar laws affecting the

enforcement of creditors' rights generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(b)     The execution, delivery and performance of this Agreement by Buyer will not conflict with or result in the breach of any term or provision of, or violate or constitute a default under, any charter provision or bylaw or under any material agreement, to which Buyer is a party or by which Buyer is in any way bound or obligated.

(c)     No governmental, administrative or other third party consents or approvals are required, necessary or appropriate on the part of Buyer in connection with the transactions contemplated by this Agreement.

(d)     Buyer understands that the Securities are "restricted securities" and have not been registered under the Securities Act of 1933, as amended (the "Securities Act") or any applicable state securities law and is acquiring the Securities as principal for its own account for investment purposes only and not with a view to or for distributing or reselling such Securities or any part thereof, has no present intention of distributing any of such Securities and has no arrangement or understanding with any other persons regarding the distribution of such Securities (this representation and warranty not limiting such Buyer's right to sell the Securities pursuant to the Registration Statement or otherwise in compliance with applicable federal and state securities laws). Buyer is acquiring the Securities hereunder in the ordinary course of its business. Buyer does not have any agreement or understanding, directly or indirectly, with any Person to distribute any of the Securities.

(e)     At the time Buyer was offered the Securities, it was, and at the date hereof it is an "accredited investor" as defined in Rule 501(a) under the Securities Act. Buyer is not required to be registered as a broker-dealer under Section 15 of the Exchange Act of 1934, as amended.

(f)     Buyer acknowledges that there exists no public market for the Securities, that no such public market may develop in the future, the Securities, when issued, will be "restricted securities" and as a result, Buyer acknowledges that the Securities must be held indefinitely unless subsequently registered under the Act or unless an exemption from such registration is available. Buyer is aware of the provisions of Rule 144 promulgated under the Act which permit resales of common stock purchased in a private placement subject to certain limitations and to the satisfaction of certain conditions provided for thereunder, including, among other things, the existence of a public market for the common stock, the availability of certain current public information about the Company, the resale occurring not less than one year after a party has purchased and paid for the security to be sold, the sale being effected through a "broker's transaction" or in transactions directly with a "market maker" and the number of shares of common stock being sold during any three-month period not exceeding specified limitations.

(g)     Buyer either alone or together with its representatives, has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of the prospective investment in the Securities, and has so evaluated the merits and risks of such investment. Buyer is able to bear the economic risk of an



2

investment in the Securities and, at the present time, is able to afford a complete loss of such investment.

(h)     Buyer is not purchasing the Securities as a result of any advertisement, article, notice or other communication regarding the Securities published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar or any other general solicitation or general advertisement.

(i)     Buyer acknowledges that Buyer has had the opportunity to ask questions of, and receive answers from the Company or any authorized person acting on its behalf concerning the Company and its proposed business plan (including its initial acquisition target and the need to raise additional capital through the offer and sale of equity and/or debt securities) and to obtain any additional information, to the extent possessed by the Company (or to the extent it could have been acquired by the Company without unreasonable effort or expense) necessary to verify the accuracy of the information received by Buyer. In connection therewith, Buyer acknowledges that Buyer has had the opportunity to discuss the Company's business, management and financial affairs with the Company's management or any authorized person acting on its behalf. Buyer has received and reviewed all the information concerning the Company and the Securities, both written and oral, that Buyer desires. Without limiting the generality of the foregoing, Buyer has been furnished with or has had the opportunity to acquire, and to review: all information, both written and oral, that Buyer desires with respect to the Company's business, management, financial affairs and prospects. In determining whether to make this investment, Buyer has relied solely on (i) Buyer's own knowledge and understanding of the Company and its business based upon Buyer's own due diligence investigations and the information furnished pursuant to this paragraph, and (ii) the information described in subparagraph 2(j) below.

(j)     Buyer has carefully considered and has discussed with the Buyer's legal, tax, accounting and financial advisors, to the extent the Buyer has deemed necessary, the suitability of this investment and the transactions contemplated by this Subscription Agreement for the Buyer's particular federal, state, local and foreign tax and financial situation and has independently determined that this investment and the transactions contemplated by this Agreement are a suitable investment for the Buyer. Buyer has relied solely on such advisors and not on any statements or representations of the Company or any of its agents. Buyer understands that Buyer (and not the Company) shall be responsible for Buyer's own tax liability that may arise as a result of this investment or the transactions contemplated by this Subscription Agreement.

(k) Buyer acknowledges and agrees that such Buyer's investment in the Company is reasonable in relation to Buyer's net worth and financial needs and Buyer is able to bear the economic risk of losing their entire investment in the Securities.

(l)     Buyer understands that any and all certificates representing the Securities and any and all securities issued in replacement thereof or in exchange therefore shall bear the following legend or one substantially similar thereto, which Buyer has read and understands:



3

"THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS AND NEITHER THE SECURITIES NOR ANY INTEREST THEREIN MAY BE OFFERED, SOLD, TRANSFERRED, PLEDGED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR SUCH LAWS OR AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT AND SUCH LAWS WHICH, IN THE OPINION OF COUNSEL FOR THIS CORPORATION, IS AVAILABLE."

In addition, the certificates representing the Securities, and any and all securities issued in replacement thereof or in exchange therefore, shall bear such legend as may be required by the securities laws of the jurisdiction in which Buyer resides.

(m)     Buyer has not been furnished with any oral representation or oral information in connection with the offering of the Securities that is not contained in, or is in any way contrary to or inconsistent with, statements made in this Agreement.

(n)     No representations or warranties have been made to Buyer by the Company or the Seller, or any officer, employee, agent, affiliate or subsidiary of the Company, other than the representations of the Seller contained herein, and in purchasing the Securities the Buyer is not relying upon any representations other than those contained in this Agreement.

(o)     Buyer represents and warrants that Buyer has kept and will keep confidential any information made available in connection with its investigation of the Company and its intended business and agrees that all such information shall be kept in confidence by the Buyer and neither be used by the Buyer for the Buyer's personal benefit (other than in connection with this Subscription) nor disclosed to any third party for any reason (other than Buyer's legal and tax advisors) notwithstanding that the Buyer's Subscription may not be accepted by the Company.

(p)     Buyer acknowledges that it is purchasing shares from Seller, whom is an "affiliate" of the Issuer as defined in Rule 405 under the Securities Act.

### 3.     Closing.

(a)     Time; Place; Outcome.     The closing of the Sale of the Securities (the "Closing") will take place on the date mutually agreed upon by Buyer and Seller, but in any event no later than June 30, 2011, unless mutually agreed to a later date by all Parties. At the Closing, Seller shall transfer to Buyer clear and marketable title to the Securities, free and clear of any and all liens, claims, encumbrances and adverse interests of any kind, by delivering to the Buyer the certificates for the Securities in negotiable form, duly endorsed in blank, with stock transfer powers executed and attached thereto, and Buyer shall deliver the funds representing the Purchase Price to Seller.



4

(b)     Conditions Precedent to Seller's Obligations. The obligations of Seller at Closing shall be subject to the satisfaction, on or prior to the Closing, of the following conditions precedent, any one or more of which may be waived by the Seller.

> (i)     Representations and Warranties. The representations of and warranties by the Buyer in Section 2 hereof shall be true and accurate on and as of the Closing.
>
> (ii)    Performance. The Buyer shall have performed and complied with all agreements and conditions contained herein or in other ancillary documents incident to the transactions contemplated by this Agreement required to be performed or complied with by him prior to or at the Closing.
>
> (iii)   Consents: Authorizations. The Buyer shall have secured all permits, consents and authorizations, if any, that shall be necessary or required lawfully to consummate this Agreement.
>
> (iv)    Proceedings and Documents. All corporate and other proceedings in connection with the transactions contemplated by this Agreement and all documents and instruments incident to such transactions shall be satisfactory in substance and form to Seller or their counsel, and Seller or their counsel shall have received all such counterpart originals (or certified or other copies) of such documents as they may reasonably request.

(c)     At any time and from time to time after the Closing, the Parties shall duly execute, acknowledge and deliver all such further assignments, conveyances, instruments and documents, and shall take such other action consistent with the terms of this Agreement to carry out the transactions contemplated by this Agreement.

4.     **Miscellaneous.**

(a)     Entire Agreement. This Agreement contains the entire understanding of the Parties and supersedes all previous verbal and written agreements. There are no other agreements, representations, or warranties other than those specifically referenced or set forth herein.

(b)     Notices. All notices or other documents under this Agreement shall be in writing and delivered in person or mailed by certified mail, postage prepaid, addressed to the Parties at the addresses first above written, on any new address designated in like manner by any party hereto.

(c)     Waiver. No delay or failure by either party to exercise any right under this Agreement, and no partial or single exercise of such right, shall constitute a waiver of that or any other right, unless otherwise expressly provided herein.



5

(d)     Survival of Agreements. All agreements, covenants, representations and warranties contained herein or made in writing in connection with the transactions contemplated hereby shall survive the execution and delivery of this Agreement.

(e)     Events of Termination. Anything herein or elsewhere to contrary notwithstanding, this Agreement may be terminated by written notice of termination at any time before the purchase of the Securities by mutual written consent of the Parties.

(f)     Governing Law. This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware. Parties submits to the jurisdiction of any state or federal court sitting in Delaware, in any action or proceeding arising out of or relating to this Agreement and agrees that all claims in respect of the action or proceeding may be heard and determined in any such court. Each Party also agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court. Parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety, or other security that might be required of any other Party with respect thereto. Each Party agrees that a final judgment in any action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law or at equity. In the event of suit under this Agreement, the prevailing party will be entitled to costs, including reasonable attorneys' fees; provided, however, in the event that damages are reduced from the original claim brought by the initiating party, the amount of costs provided shall so reflect such reduction by an equal pro rata amount.

(g)     Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of Parties and the Company and their respective successors and assigns.

(h)     Execution and Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument and a facsimile of a signature shall be deemed to be the same, and equally enforceable, as an original of such signature.

(i)     Headings. The descriptive headings of the Sections hereof are inserted for convenience only and do not constitute a part of this Agreement.



6

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of July 11, 2011.

SELLER:

Griffin Ventures Ltd

Name: Amir F Heshmatpour

BUYER:

Name: Ali Esmaili

7



**EXECUTION COPY**

## SCHEDULE A

| Name of Investor | Number of Securities | Total Purchase Price |
|---|---|---|
| Ali Esmaili | 28,000 | $100,000 |

# EXHIBIT D



## STOCK PURCHASE AGREEMENT

AGREEMENT dated November 14, 2011 by and among Griffin Ventures Ltd. ("Griffin" or "Seller"), and the investor listed on Schedule A hereto (the "Buyer"). Buyer and Seller are sometimes hereinafter collectively referred to as the "Parties".

WHEREAS, Seller is the legal and beneficial owners of an aggregate of One Hundred Twelve Thousand and One (112,001) shares (the "Securities") of common stock, par value \$0.001 per share (the "Common Stock"), of Emmaus Life Sciences, Inc., (formerly Emmaus Holdings, Inc. formerly AFH Acquisition IV, Inc.) a Delaware corporation (the "Company"); and

WHEREAS, for good and valuable consideration, Seller desires to transfer and sell to Buyer all right, title and interest in the Securities and Buyer desires to purchase all such right, title and interest in the Securities (the "Sale") in the amounts set forth in Schedule A hereto;

NOW THEREFORE, in consideration of the mutual promises herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

### 1. Sale of Securities.

(a) Securities to be Acquired. At the Closing, and upon the terms and subject to the conditions of this Agreement, and upon the representations, warranties and covenants herein made, Seller shall transfer and sell to Buyer, and Buyer agrees to purchase from the Seller, the Securities set forth on Schedule A hereto, for the Purchase Price hereinafter set forth.

(b) Purchase Price. Upon the terms and subject to the conditions set forth in this Agreement, for the aggregate sum of Four Hundred Thousand Dollars (\$400,000) (the "Purchase Price"), or \$3.5714 per share of Common Stock (the "Per Share Price"), in immediately available funds by check or wire transfer to "AFH Holding & Advisory, LLC" effective as of the date first written above, Seller hereby sell, transfer, assign and convey to Buyer, and Buyer hereby purchases from Seller, the Securities.

**2. Representations and Warranties of Buyer.** The Buyer hereby represents and warrants to each Seller, which representations and warranties shall survive the Closing, the following:

(a) Buyer has all requisite power and authority to execute, deliver and perform under this Agreement and the other agreements, certificates and instruments to be executed by Buyer in connection with or pursuant to this Agreement. Upon execution and delivery by Buyer at the Closing, this Agreement is a legal, valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, fraudulent conveyance or similar laws affecting the

enforcement of creditors' rights generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(b)     The execution, delivery and performance of this Agreement by Buyer will not conflict with or result in the breach of any term or provision of, or violate or constitute a default under, any charter provision or bylaw or under any material agreement, to which Buyer is a party or by which Buyer is in any way bound or obligated.

(c)     No governmental, administrative or other third party consents or approvals are required, necessary or appropriate on the part of Buyer in connection with the transactions contemplated by this Agreement.

(d)     Buyer understands that the Securities are "restricted securities" and have not been registered under the Securities Act of 1933, as amended (the "Securities Act") or any applicable state securities law and is acquiring the Securities as principal for its own account for investment purposes only and not with a view to or for distributing or reselling such Securities or any part thereof, has no present intention of distributing any of such Securities and has no arrangement or understanding with any other persons regarding the distribution of such Securities (this representation and warranty not limiting such Buyer's right to sell the Securities pursuant to the Registration Statement or otherwise in compliance with applicable federal and state securities laws). Buyer is acquiring the Securities hereunder in the ordinary course of its business. Buyer does not have any agreement or understanding, directly or indirectly, with any Person to distribute any of the Securities.

(e)     At the time Buyer was offered the Securities, it was, and at the date hereof it is an "accredited investor" as defined in Rule 501(a) under the Securities Act. Buyer is not required to be registered as a broker-dealer under Section 15 of the Exchange Act of 1934, as amended.

(f)     Buyer acknowledges that there exists no public market for the Securities, that no such public market may develop in the future, the Securities, when issued, will be "restricted securities" and as a result, Buyer acknowledges that the Securities must be held indefinitely unless subsequently registered under the Act or unless an exemption from such registration is available. Buyer is aware of the provisions of Rule 144 promulgated under the Act which permit resales of common stock purchased in a private placement subject to certain limitations and to the satisfaction of certain conditions provided for thereunder, including, among other things, the existence of a public market for the common stock, the availability of certain current public information about the Company, the resale occurring not less than one year after a party has purchased and paid for the security to be sold, the sale being effected through a "broker's transaction" or in transactions directly with a "market maker" and the number of shares of common stock being sold during any three-month period not exceeding specified limitations.

(g)     Buyer either alone or together with its representatives, has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of the prospective investment in the Securities, and has so evaluated the merits and risks of such investment. Buyer is able to bear the economic risk of an



2

investment in the Securities and, at the present time, is able to afford a complete loss of such investment.

(h)     Buyer is not purchasing the Securities as a result of any advertisement, article, notice or other communication regarding the Securities published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar or any other general solicitation or general advertisement.

(i)     Buyer acknowledges that Buyer has had the opportunity to ask questions of, and receive answers from the Company or any authorized person acting on its behalf concerning the Company and its proposed business plan (including its initial acquisition target and the need to raise additional capital through the offer and sale of equity and/or debt securities) and to obtain any additional information, to the extent possessed by the Company (or to the extent it could have been acquired by the Company without unreasonable effort or expense) necessary to verify the accuracy of the information received by Buyer. In connection therewith, Buyer acknowledges that Buyer has had the opportunity to discuss the Company's business, management and financial affairs with the Company's management or any authorized person acting on its behalf. Buyer has received and reviewed all the information concerning the Company and the Securities, both written and oral, that Buyer desires. Without limiting the generality of the foregoing, Buyer has been furnished with or has had the opportunity to acquire, and to review: all information, both written and oral, that Buyer desires with respect to the Company's business, management, financial affairs and prospects. In determining whether to make this investment, Buyer has relied solely on (i) Buyer's own knowledge and understanding of the Company and its business based upon Buyer's own due diligence investigations and the information furnished pursuant to this paragraph, and (ii) the information described in subparagraph 2(j) below.

(j)     Buyer has carefully considered and has discussed with the Buyer's legal, tax, accounting and financial advisors, to the extent the Buyer has deemed necessary, the suitability of this investment and the transactions contemplated by this Subscription Agreement for the Buyer's particular federal, state, local and foreign tax and financial situation and has independently determined that this investment and the transactions contemplated by this Agreement are a suitable investment for the Buyer. Buyer has relied solely on such advisors and not on any statements or representations of the Company or any of its agents. Buyer understands that Buyer (and not the Company) shall be responsible for Buyer's own tax liability that may arise as a result of this investment or the transactions contemplated by this Subscription Agreement.

(k) Buyer acknowledges and agrees that such Buyer's investment in the Company is reasonable in relation to Buyer's net worth and financial needs and Buyer is able to bear the economic risk of losing their entire investment in the Securities.

(l)     Buyer understands that any and all certificates representing the Securities and any and all securities issued in replacement thereof or in exchange therefore shall bear the following legend or one substantially similar thereto, which Buyer has read and understands:



3

"THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS AND NEITHER THE SECURITIES NOR ANY INTEREST THEREIN MAY BE OFFERED, SOLD, TRANSFERRED, PLEDGED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR SUCH LAWS OR AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT AND SUCH LAWS WHICH, IN THE OPINION OF COUNSEL FOR THIS CORPORATION, IS AVAILABLE."

In addition, the certificates representing the Securities, and any and all securities issued in replacement thereof or in exchange therefore, shall bear such legend as may be required by the securities laws of the jurisdiction in which Buyer resides.

(m)     Buyer has not been furnished with any oral representation or oral information in connection with the offering of the Securities that is not contained in, or is in any way contrary to or inconsistent with, statements made in this Agreement.

(n)     No representations or warranties have been made to Buyer by the Company or the Seller, or any officer, employee, agent, affiliate or subsidiary of the Company, other than the representations of the Seller contained herein, and in purchasing the Securities the Buyer is not relying upon any representations other than those contained in this Agreement.

(o)     Buyer represents and warrants that Buyer has kept and will keep confidential any information made available in connection with its investigation of the Company and its intended business and agrees that all such information shall be kept in confidence by the Buyer and neither be used by the Buyer for the Buyer's personal benefit (other than in connection with this Subscription) nor disclosed to any third party for any reason (other than Buyer's legal and tax advisors) notwithstanding that the Buyer's Subscription may not be accepted by the Company.

(p)     Buyer acknowledges that it is purchasing shares from Seller, whom is an "affiliate" of the Issuer as defined in Rule 405 under the Securities Act.

### 3.     Closing.

(a)     Time; Place; Outcome.   The closing of the Sale of the Securities (the "Closing") will take place on the date mutually agreed upon by Buyer and Seller, but in any event no later than November 30, 2011, unless mutually agreed to a later date by all Parties. At the Closing, Seller shall transfer to Buyer clear and marketable title to the Securities, free and clear of any and all liens, claims, encumbrances and adverse interests of any kind, by delivering to the Buyer the certificates for the Securities in negotiable form, duly endorsed in blank, with stock transfer powers executed and attached thereto, and Buyer shall deliver the funds representing the Purchase Price to Seller.

(b)     Conditions Precedent to Seller's Obligations. The obligations of Seller at Closing shall be subject to the satisfaction, on or prior to the Closing, of the following conditions precedent, any one or more of which may be waived by the Seller.

(i)     Representations and Warranties.     The representations of and warranties by the Buyer in Section 2 hereof shall be true and accurate on and as of the Closing.

(ii)    Performance. The Buyer shall have performed and complied with all agreements and conditions contained herein or in other ancillary documents incident to the transactions contemplated by this Agreement required to be performed or complied with by him prior to or at the Closing.

(iii)   Consents; Authorizations.     The Buyer shall have secured all permits, consents and authorizations, if any, that shall be necessary or required lawfully to consummate this Agreement.

(iv)    Proceedings and Documents. All corporate and other proceedings in connection with the transactions contemplated by this Agreement and all documents and instruments incident to such transactions shall be satisfactory in substance and form to Seller or their counsel, and Seller or their counsel shall have received all such counterpart originals (or certified or other copies) of such documents as they may reasonably request.

(c)     At any time and from time to time after the Closing, the Parties shall duly execute, acknowledge and deliver all such further assignments, conveyances, instruments and documents, and shall take such other action consistent with the terms of this Agreement to carry out the transactions contemplated by this Agreement.

**4.     Miscellaneous.**

(a)     Entire Agreement. This Agreement contains the entire understanding of the Parties and supersedes all previous verbal and written agreements. There are no other agreements, representations, or warranties other than those specifically referenced or set forth herein.

(b)     Notices. All notices or other documents under this Agreement shall be in writing and delivered in person or mailed by certified mail, postage prepaid, addressed to the Parties at the addresses first above written, on any new address designated in like manner by any party hereto.

(c)     Waiver. No delay or failure by either party to exercise any right under this Agreement, and no partial or single exercise of such right, shall constitute a waiver of that or any other right, unless otherwise expressly provided herein.



5

(d)  Survival of Agreements.  All agreements, covenants, representations and warranties contained herein or made in writing in connection with the transactions contemplated hereby shall survive the execution and delivery of this Agreement.

(e)  Events of Termination.  Anything herein or elsewhere to contrary notwithstanding, this Agreement may be terminated by written notice of termination at any time before the purchase of the Securities by mutual written consent of the Parties.

(f)  Governing Law.  This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware.  Parties submits to the jurisdiction of any state or federal court sitting in Delaware, in any action or proceeding arising out of or relating to this Agreement and agrees that all claims in respect of the action or proceeding may be heard and determined in any such court.  Each Party also agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court.  Parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety, or other security that might be required of any other Party with respect thereto.  Each Party agrees that a final judgment in any action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law or at equity.  In the event of suit under this Agreement, the prevailing party will be entitled to costs, including reasonable attorneys' fees; provided, however, in the event that damages are reduced from the original claim brought by the initiating party, the amount of costs provided shall so reflect such reduction by an equal pro rata amount.

(g)  Successors and Assigns.  The provisions of this Agreement shall be binding upon and inure to the benefit of Parties and the Company and their respective successors and assigns.

(h)  Execution and Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument and a facsimile of a signature shall be deemed to be the same, and equally enforceable, as an original of such signature.

(i)  Headings.  The descriptive headings of the Sections hereof are inserted for convenience only and do not constitute a part of this Agreement.



6

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of November 14, 2011.

SELLER:

Griffin Ventures Ltd.

Name: Amir F Heshmatpour

BUYER:

Name: Ali Esmaili

7



**EXECUTION COPY**

## SCHEDULE A

| Name of Investor | Number of Securities | Total Purchase Price |
|---|---|---|
| Ali Esmaili | 112,001 | $400,000 |

**EXHIBIT E**



**EXECUTION COPY**

## STOCK PURCHASE AGREEMENT

AGREEMENT dated November 21, 2011 by and among Griffin Ventures Ltd. ("Griffin" or "Seller"), and the investor listed on Schedule A hereto (the "Buyer"). Buyer and Seller are sometimes hereinafter collectively referred to as the "Parties".

WHEREAS, Seller is the legal and beneficial owners of an aggregate of One Hundred Fifty Nine Thousand Nine Hundred Ninety Nine (159,999) shares (the "Securities") of common stock, par value $0.001 per share (the "Common Stock"), of Emmaus Life Sciences, Inc., (formerly Emmaus Holdings, Inc. formerly AFH Acquisition IV, Inc.) a Delaware corporation (the "Company"); and

WHEREAS, for good and valuable consideration, Seller desires to transfer and sell to Buyer all right, title and interest in the Securities and Buyer desires to purchase all such right, title and interest in the Securities (the "Sale") in the amounts set forth in Schedule A hereto;

NOW THEREFORE, in consideration of the mutual promises herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

### 1. Sale of Securities.

(a)    Securities to be Acquired. At the Closing, and upon the terms and subject to the conditions of this Agreement, and upon the representations, warranties and covenants herein made, Seller shall transfer and sell to Buyer, and Buyer agrees to purchase from the Seller, the Securities set forth on Schedule A hereto, for the Purchase Price hereinafter set forth.

(b)    Purchase Price. Upon the terms and subject to the conditions set forth in this Agreement, for the aggregate sum of Forty Thousand Dollars ($40,000) (the "Purchase Price"), or $3.5714 per share of Common Stock (the "Per Share Price"), in immediately available funds by check or wire transfer to "AFH Holding & Advisory, LLC" effective as of the date first written above, Seller hereby sell, transfer, assign and convey to Buyer, and Buyer hereby purchases from Seller, the Securities.

### 2. Representations and Warranties of Buyer. The Buyer hereby represents and warrants to each Seller, which representations and warranties shall survive the Closing, the following:

(a)    Buyer has all requisite power and authority to execute, deliver and perform under this Agreement and the other agreements, certificates and instruments to be executed by Buyer in connection with or pursuant to this Agreement. Upon execution and delivery by Buyer at the Closing, this Agreement is a legal, valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by

A7/d

applicable bankruptcy, insolvency, fraudulent conveyance or similar laws affecting the enforcement of creditors' rights generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(b)     The execution, delivery and performance of this Agreement by Buyer will not conflict with or result in the breach of any term or provision of, or violate or constitute a default under, any charter provision or bylaw or under any material agreement, to which Buyer is a party or by which Buyer is in any way bound or obligated.

(c)     No governmental, administrative or other third party consents or approvals are required, necessary or appropriate on the part of Buyer in connection with the transactions contemplated by this Agreement.

(d)     Buyer understands that the Securities are "restricted securities" and have not been registered under the Securities Act of 1933, as amended (the "Securities Act") or any applicable state securities law and is acquiring the Securities as principal for its own account for investment purposes only and not with a view to or for distributing or reselling such Securities or any part thereof, has no present intention of distributing any of such Securities and has no arrangement or understanding with any other persons regarding the distribution of such Securities (this representation and warranty not limiting such Buyer's right to sell the Securities pursuant to the Registration Statement or otherwise in compliance with applicable federal and state securities laws). Buyer is acquiring the Securities hereunder in the ordinary course of its business. Buyer does not have any agreement or understanding, directly or indirectly, with any Person to distribute any of the Securities.

(e)     At the time Buyer was offered the Securities, it was, and at the date hereof it is an "accredited investor" as defined in Rule 501(a) under the Securities Act. Buyer is not required to be registered as a broker-dealer under Section 15 of the Exchange Act of 1934, as amended.

(f)     Buyer acknowledges that there exists no public market for the Securities, that no such public market may develop in the future, the Securities, when issued, will be "restricted securities" and as a result, Buyer acknowledges that the Securities must be held indefinitely unless subsequently registered under the Act or unless an exemption from such registration is available. Buyer is aware of the provisions of Rule 144 promulgated under the Act which permit resales of common stock purchased in a private placement subject to certain limitations and to the satisfaction of certain conditions provided for thereunder, including, among other things, the existence of a public market for the common stock, the availability of certain current public information about the Company, the resale occurring not less than one year after a party has purchased and paid for the security to be sold, the sale being effected through a "broker's transaction" or in transactions directly with a "market maker" and the number of shares of common stock being sold during any three-month period not exceeding specified limitations.

(g)     Buyer either alone or together with its representatives, has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of the prospective investment in the Securities, and has so



2

evaluated the merits and risks of such investment. Buyer is able to bear the economic risk of an investment in the Securities and, at the present time, is able to afford a complete loss of such investment.

(h)     Buyer is not purchasing the Securities as a result of any advertisement, article, notice or other communication regarding the Securities published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar or any other general solicitation or general advertisement.

(i)     Buyer acknowledges that Buyer has had the opportunity to ask questions of, and receive answers from the Company or any authorized person acting on its behalf concerning the Company and its proposed business plan (including its initial acquisition target and the need to raise additional capital through the offer and sale of equity and/or debt securities) and to obtain any additional information, to the extent possessed by the Company (or to the extent it could have been acquired by the Company without unreasonable effort or expense) necessary to verify the accuracy of the information received by Buyer. In connection therewith, Buyer acknowledges that Buyer has had the opportunity to discuss the Company's business, management and financial affairs with the Company's management or any authorized person acting on its behalf. Buyer has received and reviewed all the information concerning the Company and the Securities, both written and oral, that Buyer desires. Without limiting the generality of the foregoing, Buyer has been furnished with or has had the opportunity to acquire, and to review: all information, both written and oral, that Buyer desires with respect to the Company's business, management, financial affairs and prospects. In determining whether to make this investment, Buyer has relied solely on (i) Buyer's own knowledge and understanding of the Company and its business based upon Buyer's own due diligence investigations and the information furnished pursuant to this paragraph, and (ii) the information described in subparagraph 2(j) below.

(j)     Buyer has carefully considered and has discussed with the Buyer's legal, tax, accounting and financial advisors, to the extent the Buyer has deemed necessary, the suitability of this investment and the transactions contemplated by this Subscription Agreement for the Buyer's particular federal, state, local and foreign tax and financial situation and has independently determined that this investment and the transactions contemplated by this Agreement are a suitable investment for the Buyer. Buyer has relied solely on such advisors and not on any statements or representations of the Company or any of its agents. Buyer understands that Buyer (and not the Company) shall be responsible for Buyer's own tax liability that may arise as a result of this investment or the transactions contemplated by this Subscription Agreement.

(k) Buyer acknowledges and agrees that such Buyer's investment in the Company is reasonable in relation to Buyer's net worth and financial needs and Buyer is able to bear the economic risk of losing their entire investment in the Securities.



(l)     Buyer understands that any and all certificates representing the Securities and any and all securities issued in replacement thereof or in exchange therefore shall bear the following legend or one substantially similar thereto, which Buyer has read and understands:

"THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS AND NEITHER THE SECURITIES NOR ANY INTEREST THEREIN MAY BE OFFERED, SOLD, TRANSFERRED, PLEDGED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR SUCH LAWS OR AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT AND SUCH LAWS WHICH, IN THE OPINION OF COUNSEL FOR THIS CORPORATION, IS AVAILABLE."

In addition, the certificates representing the Securities, and any and all securities issued in replacement thereof or in exchange therefore, shall bear such legend as may be required by the securities laws of the jurisdiction in which Buyer resides.

(m)     Buyer has not been furnished with any oral representation or oral information in connection with the offering of the Securities that is not contained in, or is in any way contrary to or inconsistent with, statements made in this Agreement.

(n)     No representations or warranties have been made to Buyer by the Company or the Seller, or any officer, employee, agent, affiliate or subsidiary of the Company, other than the representations of the Seller contained herein, and in purchasing the Securities the Buyer is not relying upon any representations other than those contained in this Agreement.

(o)     Buyer represents and warrants that Buyer has kept and will keep confidential any information made available in connection with its investigation of the Company and its intended business and agrees that all such information shall be kept in confidence by the Buyer and neither be used by the Buyer for the Buyer's personal benefit (other than in connection with this Subscription) nor disclosed to any third party for any reason (other than Buyer's legal and tax advisors) notwithstanding that the Buyer's Subscription may not be accepted by the Company.

(p)     Buyer acknowledges that it is purchasing shares from-Seller, whom is an "affiliate" of the Issuer as defined in Rule 405 under the Securities Act.

## 3.     Closing.

(a)     Time; Place; Outcome. The closing of the Sale of the Securities (the "Closing") will take place on the date mutually agreed upon by Buyer and Seller, but in any event no later than November 30, 2011, unless mutually agreed to a later date by all Parties. At the Closing, Seller shall transfer to Buyer clear and marketable title to the Securities, free and clear of any and all liens, claims, encumbrances and adverse interests of any kind, by delivering to the Buyer the certificates for the Securities in negotiable form, duly endorsed in blank, with stock



4

transfer powers executed and attached thereto, and Buyer shall deliver the funds representing the Purchase Price to Seller.

(b) Conditions Precedent to Seller's Obligations. The obligations of Seller at Closing shall be subject to the satisfaction, on or prior to the Closing, of the following conditions precedent, any one or more of which may be waived by the Seller.

(i) Representations and Warranties. The representations of and warranties by the Buyer in Section 2 hereof shall be true and accurate on and as of the Closing.

(ii) Performance. The Buyer shall have performed and complied with all agreements and conditions contained herein or in other ancillary documents incident to the transactions contemplated by this Agreement required to be performed or complied with by him prior to or at the Closing.

(iii) Consents; Authorizations. The Buyer shall have secured all permits, consents and authorizations, if any, that shall be necessary or required lawfully to consummate this Agreement.

(iv) Proceedings and Documents. All corporate and other proceedings in connection with the transactions contemplated by this Agreement and all documents and instruments incident to such transactions shall be satisfactory in substance and form to Seller or their counsel, and Seller or their counsel shall have received all such counterpart originals (or certified or other copies) of such documents as they may reasonably request.

(c) At any time and from time to time after the Closing, the Parties shall duly execute, acknowledge and deliver all such further assignments, conveyances, instruments and documents, and shall take such other action consistent with the terms of this Agreement to carry out the transactions contemplated by this Agreement.

## 4. Miscellaneous.

(a) Entire Agreement. This Agreement contains the entire understanding of the Parties and supersedes all previous verbal and written agreements. There are no other agreements, representations, or warranties other than those specifically referenced or set forth herein.

(b) Notices. All notices or other documents under this Agreement shall be in writing and delivered in person or mailed by certified mail, postage prepaid, addressed to the Parties at the addresses first above written, on any new address designated in like manner by any party hereto.



5

(c)     Waiver.  No delay or failure by either party to exercise any right under this Agreement, and no partial or single exercise of such right, shall constitute a waiver of that or any other right, unless otherwise expressly provided herein.

(d)     Survival of Agreements.  All agreements, covenants, representations and warranties contained herein or made in writing in connection with the transactions contemplated hereby shall survive the execution and delivery of this Agreement.

(e)     Events of Termination.     Anything herein or elsewhere to contrary notwithstanding, this Agreement may be terminated by written notice of termination at any time before the purchase of the Securities by mutual written consent of the Parties.

(f)     Governing Law.  This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware.  Parties submits to the jurisdiction of any state or federal court sitting in Delaware, in any action or proceeding arising out of or relating to this Agreement and agrees that all claims in respect of the action or proceeding may be heard and determined in any such court.  Each Party also agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court.  Parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety, or other security that might be required of any other Party with respect thereto.  Each Party agrees that a final judgment in any action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law or at equity.  In the event of suit under this Agreement, the prevailing party will be entitled to costs, including reasonable attorneys' fees; provided, however, in the event that damages are reduced from the original claim brought by the initiating party, the amount of costs provided shall so reflect such reduction by an equal pro rata amount.

(g)     Successors and Assigns.  The provisions of this Agreement shall be binding upon and inure to the benefit of Parties and the Company and their respective successors and assigns.

(h)     Execution and Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument and a facsimile of a signature shall be deemed to be the same, and equally enforceable, as an original of such signature.

(i)     Headings.  The descriptive headings of the Sections hereof are inserted for convenience only and do not constitute a part of this Agreement.



6

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of November 21, 2011.

SELLER:

Griffin Ventures Ltd

Name: Amir F Heshmatpour

BUYER:

Name: Sohrab Sepehran

7



**EXECUTION COPY**

## SCHEDULE A

| Name of Investor | Number of Securities | Total Purchase Price |
|---|---|---|
| Sohrab Sepehran | 11,200 | $40,000 |

**EXHIBIT F**



**EXECUTION COPY**

## STOCK PURCHASE AGREEMENT

AGREEMENT dated January 9th, 2012 by and among Griffin Ventures Ltd. ("Griffin" or "Seller"), and the investor listed on Schedule A hereto (the "Buyer"). Buyer and Seller are sometimes hereinafter collectively referred to as the "Parties".

WHEREAS, Seller is the legal and beneficial owners of an aggregate of One Hundred Fifty Nine Thousand Nine Hundred Ninety Nine (148,799) shares (the "Securities") of common stock, par value $0.001 per share (the "Common Stock"), of Emmaus Life Sciences, Inc., (formerly Emmaus Holdings, Inc. formerly AFH Acquisition IV, Inc.) a Delaware corporation (the "Company"); and

WHEREAS, for good and valuable consideration, Seller desires to transfer and sell to Buyer all right, title and interest in the Securities and Buyer desires to purchase all such right, title and interest in the Securities (the "Sale") in the amounts set forth in Schedule A hereto;

NOW THEREFORE, in consideration of the mutual promises herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.     **Sale of Securities.**

(a)     Securities to be Acquired. At the Closing, and upon the terms and subject to the conditions of this Agreement, and upon the representations, warranties and covenants herein made, Seller shall transfer and sell to Buyer, and Buyer agrees to purchase from the Seller, the Securities set forth on Schedule A hereto, for the Purchase Price hereinafter set forth.

(b)     Purchase Price. Upon the terms and subject to the conditions set forth in this Agreement, for the aggregate sum of Sixty Thousand Dollars ($60,000) (the "Purchase Price"), or $3.5714 per share of Common Stock (the "Per Share Price"), in immediately available funds by check or wire transfer to "AFH Holding & Advisory, LLC" effective as of the date first written above, Seller hereby sell, transfer, assign and convey to Buyer, and Buyer hereby purchases from Seller, the Securities.

2.     **Representations and Warranties of Buyer.** The Buyer hereby represents and warrants to each Seller, which representations and warranties shall survive the Closing, the following:

(a)     Buyer has all requisite power and authority to execute, deliver and perform under this Agreement and the other agreements, certificates and instruments to be executed by Buyer in connection with or pursuant to this Agreement. Upon execution and delivery by Buyer at the Closing, this Agreement is a legal, valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, fraudulent conveyance or similar laws affecting

the enforcement of creditors' rights generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(b)     The execution, delivery and performance of this Agreement by Buyer will not conflict with or result in the breach of any term or provision of, or violate or constitute a default under, any charter provision or bylaw or under any material agreement, to which Buyer is a party or by which Buyer is in any way bound or obligated.

(c)     No governmental, administrative or other third party consents or approvals are required, necessary or appropriate on the part of Buyer in connection with the transactions contemplated by this Agreement.

(d)     Buyer understands that the Securities are "restricted securities" and have not been registered under the Securities Act of 1933, as amended (the "Securities Act") or any applicable state securities law and is acquiring the Securities as principal for its own account for investment purposes only and not with a view to or for distributing or reselling such Securities or any part thereof, has no present intention of distributing any of such Securities and has no arrangement or understanding with any other persons regarding the distribution of such Securities (this representation and warranty not limiting such Buyer's right to sell the Securities pursuant to the Registration Statement or otherwise in compliance with applicable federal and state securities laws). Buyer is acquiring the Securities hereunder in the ordinary course of its business. Buyer does not have any agreement or understanding, directly or indirectly, with any Person to distribute any of the Securities.

(e)     At the time Buyer was offered the Securities, it was, and at the date hereof it is an "accredited investor" as defined in Rule 501(a) under the Securities Act. Buyer is not required to be registered as a broker-dealer under Section 15 of the Exchange Act of 1934, as amended.

(f)  Buyer acknowledges that there exists no public market for the Securities, that no such public market may develop in the future, the Securities, when issued, will be "restricted securities" and as a result, Buyer acknowledges that the Securities must be held indefinitely unless subsequently registered under the Act or unless an exemption from such registration is available. Buyer is aware of the provisions of Rule 144 promulgated under the Act which permit resales of common stock purchased in a private placement subject to certain limitations and to the satisfaction of certain conditions provided for thereunder, including, among other things, the existence of a public market for the common stock, the availability of certain current public information about the Company, the resale occurring not less than one year after a party has purchased and paid for the security to be sold, the sale being effected through a "broker's transaction" or in transactions directly with a "market maker" and the number of shares of common stock being sold during any three-month period not exceeding specified limitations.

(g)     Buyer either alone or together with its representatives, has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of the prospective investment in the Securities, and has so evaluated the merits and risks of such investment. Buyer is able to bear the economic risk of an

2

investment in the Securities and, at the present time, is able to afford a complete loss of such investment.

(h)    Buyer is not purchasing the Securities as a result of any advertisement, article, notice or other communication regarding the Securities published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar or any other general solicitation or general advertisement.

(i)    Buyer acknowledges that Buyer has had the opportunity to ask questions of, and receive answers from the Company or any authorized person acting on its behalf concerning the Company and its proposed business plan (including its initial acquisition target and the need to raise additional capital through the offer and sale of equity and/or debt securities) and to obtain any additional information, to the extent possessed by the Company (or to the extent it could have been acquired by the Company without unreasonable effort or expense) necessary to verify the accuracy of the information received by Buyer. In connection therewith, Buyer acknowledges that Buyer has had the opportunity to discuss the Company's business, management and financial affairs with the Company's management or any authorized person acting on its behalf. Buyer has received and reviewed all the information concerning the Company and the Securities, both written and oral, that Buyer desires. Without limiting the generality of the foregoing, Buyer has been furnished with or has had the opportunity to acquire, and to review: all information, both written and oral, that Buyer desires with respect to the Company's business, management, financial affairs and prospects. In determining whether to make this investment, Buyer has relied solely on (i) Buyer's own knowledge and understanding of the Company and its business based upon Buyer's own due diligence investigations and the information furnished pursuant to this paragraph, and (ii) the information described in subparagraph 2(j) below.

(j)    Buyer has carefully considered and has discussed with the Buyer's legal, tax, accounting and financial advisors, to the extent the Buyer has deemed necessary, the suitability of this investment and the transactions contemplated by this Subscription Agreement for the Buyer's particular federal, state, local and foreign tax and financial situation and has independently determined that this investment and the transactions contemplated by this Agreement are a suitable investment for the Buyer. Buyer has relied solely on such advisors and not on any statements or representations of the Company or any of its agents. Buyer understands that Buyer (and not the Company) shall be responsible for Buyer's own tax liability that may arise as a result of this investment or the transactions contemplated by this Subscription Agreement.

(k) Buyer acknowledges and agrees that such Buyer's investment in the Company is reasonable in relation to Buyer's net worth and financial needs and Buyer is able to bear the economic risk of losing their entire investment in the Securities.

(l)    Buyer understands that any and all certificates representing the Securities and any and all securities issued in replacement thereof or in exchange therefore shall bear the following legend or one substantially similar thereto, which Buyer has read and understands:

3

"THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS AND NEITHER THE SECURITIES NOR ANY INTEREST THEREIN MAY BE OFFERED, SOLD, TRANSFERRED, PLEDGED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR SUCH LAWS OR AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT AND SUCH LAWS WHICH, IN THE OPINION OF COUNSEL FOR THIS CORPORATION, IS AVAILABLE."

In addition, the certificates representing the Securities, and any and all securities issued in replacement thereof or in exchange therefore, shall bear such legend as may be required by the securities laws of the jurisdiction in which Buyer resides.

(m)     Buyer has not been furnished with any oral representation or oral information in connection with the offering of the Securities that is not contained in, or is in any way contrary to or inconsistent with, statements made in this Agreement.

(n)     No representations or warranties have been made to Buyer by the Company or the Seller, or any officer, employee, agent, affiliate or subsidiary of the Company, other than the representations of the Seller contained herein, and in purchasing the Securities the Buyer is not relying upon any representations other than those contained in this Agreement.

(o)     Buyer represents and warrants that Buyer has kept and will keep confidential any information made available in connection with its investigation of the Company and its intended business and agrees that all such information shall be kept in confidence by the Buyer and neither be used by the Buyer for the Buyer's personal benefit (other than in connection with this Subscription) nor disclosed to any third party for any reason (other than Buyer's legal and tax advisors) notwithstanding that the Buyer's Subscription may not be accepted by the Company.

(p)     Buyer acknowledges that it is purchasing shares from Seller, whom is an "affiliate" of the Issuer as defined in Rule 405 under the Securities Act.

## 3.     Closing.

(a)     Time; Place; Outcome. The closing of the Sale of the Securities (the "Closing") will take place on the date mutually agreed upon by Buyer and Seller, but in any event no later than January 31st, 2012, unless mutually agreed to a later date by all Parties. At the Closing, Seller shall transfer to Buyer clear and marketable title to the Securities, free and clear of any and all liens, claims, encumbrances and adverse interests of any kind, by delivering to the Buyer the certificates for the Securities in negotiable form, duly endorsed in blank, with stock transfer powers executed and attached thereto, and Buyer shall deliver the funds representing the Purchase Price to Seller.

4

(b)     Conditions Precedent to Seller's Obligations. The obligations of Seller at Closing shall be subject to the satisfaction, on or prior to the Closing, of the following conditions precedent, any one or more of which may be waived by the Seller.

(i)     Representations and Warranties.  The representations of and warranties by the Buyer in Section 2 hereof shall be true and accurate on and as of the Closing.

(ii)     Performance.  The Buyer shall have performed and complied with all agreements and conditions contained herein or in other ancillary documents incident to the transactions contemplated by this Agreement required to be performed or complied with by him prior to or at the Closing.

(iii)     Consents; Authorizations.   The Buyer shall have secured all permits, consents and authorizations, if any, that shall be necessary or required lawfully to consummate this Agreement.

(iv)     Proceedings and Documents. All corporate and other proceedings in connection with the transactions contemplated by this Agreement and all documents and instruments incident to such transactions shall be satisfactory in substance and form to Seller or their counsel, and Seller or their counsel shall have received all such counterpart originals (or certified or other copies) of such documents as they may reasonably request.

(c)     At any time and from time to time after the Closing, the Parties shall duly execute, acknowledge and deliver all such further assignments, conveyances, instruments and documents, and shall take such other action consistent with the terms of this Agreement to carry out the transactions contemplated by this Agreement.

## 4.     Miscellaneous.

(a)     Entire Agreement. This Agreement contains the entire understanding of the Parties and supersedes all previous verbal and written agreements. There are no other agreements, representations, or warranties other than those specifically referenced or set forth herein.

(b)     Notices. All notices or other documents under this Agreement shall be in writing and delivered in person or mailed by certified mail, postage prepaid, addressed to the Parties at the addresses first above written, on any new address designated in like manner by any party hereto.

(c)     Waiver. No delay or failure by either party to exercise any right under this Agreement, and no partial or single exercise of such right, shall constitute a waiver of that or any other right, unless otherwise expressly provided herein.

(d)     Survival of Agreements.  All agreements, covenants, representations and warranties contained herein or made in writing in connection with the transactions contemplated hereby shall survive the execution and delivery of this Agreement.

(e)     Events of Termination.     Anything herein or elsewhere to contrary notwithstanding, this Agreement may be terminated by written notice of termination at any time before the purchase of the Securities by mutual written consent of the Parties.

(f)     Governing Law.  This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware.  Parties submits to the jurisdiction of any state or federal court sitting in Delaware, in any action or proceeding arising out of or relating to this Agreement and agrees that all claims in respect of the action or proceeding may be heard and determined in any such court.  Each Party also agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court.  Parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety, or other security that might be required of any other Party with respect thereto.  Each Party agrees that a final judgment in any action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law or at equity.  In the event of suit under this Agreement, the prevailing party will be entitled to costs, including reasonable attorneys' fees; provided, however, in the event that damages are reduced from the original claim brought by the initiating party, the amount of costs provided shall so reflect such reduction by an equal pro rata amount.

(g)     Successors and Assigns.    The provisions of this Agreement shall be binding upon and inure to the benefit of Parties and the Company and their respective successors and assigns.

(h)     Execution and Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument and a facsimile of a signature shall be deemed to be the same, and equally enforceable, as an original of such signature.

(i)     Headings.  The descriptive headings of the Sections hereof are inserted for convenience only and do not constitute a part of this Agreement.

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of January 9, 2012.

SELLER:

Griffin Ventures Ltd

Name: Amir F Heshmatpour

BUYER:

Name: Sohrab Sepehran

7

 **EXECUTION COPY**

## SCHEDULE A

| Name of Investor | Number of Securities | Total Purchase Price |
|------------------|----------------------|----------------------|
| Sohrab Sepehran | 16,800 | $60,000 |

# EXHIBIT G



# MEMOIR

- **Home**
- **About Us**
- **How Amir Spends Your Money »**
- **Victims**
- **Contact Us**

# Coming Soon!



**This site will reveal the truth behind Amir Heshmatpour, Kathy Heshmatpour and AFH Holding And Advisory…and will include the following:**

- The stories of people scammed by Amir Heshmatpour…in their own words-Copies of all civil cases, past and present
- Copies of restraining orders from past investors and business partners
- Detailed proof of the lies Amir has told people
- How he and his family enjoy their life with the money he has stolen
- A romantic incest family scandal

If you've been scammed by Amir, email us at info@amirheshmatpour.net

Designed by Elegant Themes

# EXHIBIT H

Ripoff Report | Complaints Reviews Scams Lawsuits Frauds Reported. File your review. Consumers educating consumers. "

By consumers, for consumers...

Don't let them get away with it.® Let the truth be known!™

**Home**    **Help**                                                                                                      **Register to File a Report**          **Login**

Is there a Ripoff Report about you!? SEO Reputation Management WARNING!    lick
                                                                                                        Legal
**REPORT**    a Report  |  Re Here Now! Resources  |  Say Thank You  |  Directory    **Corporate Advocacy**    Repair your reputation the right way

 ☐ Ripoff Report protects consumers first amendment right to free speech                **Review Latest Reports    Advanced Search    Browse Categories**

## Register

If you want to file a Ripoff Report or a Rebuttal to a Ripoff Report you need to register first. Registration is free. This information is for our records only! Our staff may contact you regarding your report for any follow-up and possible help with your rip-off situation. Please read our Privacy Policy for complete details.

After registering, you will be sent an email that will have a link you need to click in order to verify your email address. You must verify your email address in order to receive our best support. We will NEVER reveal your identity or email you if you opt-out. Our goal is to protect consumers! But don't miss your opportunity to inform the press or get support from lawyers in regards to your issue. We cannot pursue prosecution of unscrupulous companies and individuals if we cannot contact you.

### Account Details

| | |
|---|---|
| **Email Address** | |
| **Confirm Address** | |
| | |
| **Password** | |
| **Confirm Password** | |

The name you enter here will be displayed on reports and rebuttals you file. Use your first name, other nickname, alias, or anonymous

**Display Name:**

Your full first and last name is for our records only and will not be displayed on any filings.

**Name:**

**Street 1**

**Apt. #, Suite #**

**City**

**State**    Select State/Province  ▾

**Zip**

**Country**    USA ▾

**Primary Phone**

**Alternate Phone**

### User Preferences

☑ I am willing to be contacted by the media, a consumer advocate, lawyer or government authority to help further my cause or to help with an investigation against the business or individual I am reporting.

☑ Send me the contact information if a lawyer is interested in my particular case or is possibly starting a class-action lawsuit.

☑ Notify me when someone files a rebuttal or consumer comment to my report. Note: If multiple rebuttals are made in one day you will receive multiple e-mails.

☑ Notify me when someone files a rebuttal or consumer comment to a rebuttal I have filed on a report. Note: If multiple rebuttals are made in one day you will receive multiple e-mails.

☑ Send me e-mail from Ripoff Report about my categories of interest, special events, newsletters, or other notices. Note: This is for Ripoff Report branded communications only as Ripoff Report does NOT rent or sell your personal information to 3rd parties for their marketing purposes.

Create my account



## **Ripoff Report**

| .... | ......... | **Consumer Resources** | **Search** | **Link to Ripoff Report** | **Contact Us** | **Email Us** |

| **Privacy Policy** | ................ | .... | **About Us** | ........................................... |

| **Thank You Emails!** | ......................................................... | **Ed Magedson - Ripoff Report Founder** |

| ........................ | **Donate to our Legal Defense** | **BadBusinessBureau.com** |

Copyright © 1998-2012, Ripoff Report. All rights reserved.

# EXHIBIT I

**Ripoff Report** | Complaints Reviews Scams Lawsuits Frauds Reported. File your review. Consumers educating consumers.™

By consumers, for consumers...

Don't let them get away with it.® Let the truth be known!™

**Home    Help**                                                                                   **Register to File a Report        Login**

FILE A | Update | Latest | Consumer | Consumers | Legal |  Report your reputation the right way | Company Rebuttal or Rebuttal
REPORT | a Report | Reports | Resources | Say Thank You | Directory | **Corporate Advocacy**

Is there a Ripoff Report about you!? SEO Reputation Management WARNING!   Click Here Now!

We are always here to support you! Need help now? Contact support here

## Frequently Asked Questions (FAQ)

### Technical Support

- I am having problems searching and filing reports. How do I make sure JavaScript is enabled in my browser and that my browser accepts cookies from Ripoff Report?
- After I login the Check Your E-mail page is displayed. How do I file a report?
- Why can't I login with my e-mail address and password?
- Why won't the site accept my e-mail address when I am trying to register?
- I can't access the link in the Complete Ripoff Report Registration e-mail message to get to confirmation page. How do I complete my registration?
- How can I change my e-mail address?
- I am trying to file a rebuttal to an existing report, why does the site asks me to register or login?
- After I login the site takes me back to the registration page? How do I get out of this and file a report?
- How do I submit an update to a report I filed?

### General Questions

- What is the Ripoff Report?
- How do I file a Ripoff Report?
- How secure is my personal information?
- Are Ripoff Reports ever censored?
- How do I send photos to go with my Ripoff Report?
- What makes a good Ripoff Report?
- How can my story be featured on the front page?
- How does Ripoff Report compare to the Better Business Bureau?
- Legal Disclaimer

**I am having problems searching and filing reports. How do I make sure JavaScript is enabled in my browser and that my browser accepts cookies from Ripoff Report?**

Some features of Ripoff Report, including advanced search and filing a report, require that your browser has JavaScript enabled and accepts cookies for Ripoff Report.
**Check your browser and find instructions here.**

**After I login the Check Your E-mail page is displayed. How do I file a report?**

Ripoff Report has updated its filing process to verify e-mail addresses for new and returning users. Login to login.aspx to update your account using login button located at the top of every page.

Once you login an e-mail message will be sent to you with a confirmation code. It may take 5-10 minutes for you to receive this e-mail. If you don't receive it check your Junk E-mail or Spam Quarantine folder.

Follow the link in the e-mail message or go to http://www.ripoffreport.com/login.aspx and enter your e-mail address and confirmation code to activate your account and update your e-mail preferences. If you want to receive notifications when a rebuttal is filed make sure to check the boxes next to the "Notify me" options.

**Why can't I login with my e-mail address and password?**

If you are trying to login and receive the message "Incorrect Password" please use the Forgot your Password link http://www.ripoffreport.com/ForgotPassword.aspx to have your Account Information, including your password, sent your e-mail address.

**Passwords in our system are case sensitive.** Please make sure you type in your password the same way it appears in the Account Information Reminder e-mail message. If you entered your password in ALL UPPER CASE then you need to

reenter it in upper case. The same is true for lower case.

You can change your password at any time by going to Edit Profile, https://www.ripoffreport.com/MyProfile.aspx

**Why won't the site accept my e-mail address when I am trying to register?**

In order to register with Ripoff Report and file a report or rebuttal you must fill out all fields in **bold** and set a password that is greater than six characters. Register with Ripoff Report at http://www.ripoffreport.com/Register.aspx.

If the Register page is displayed again after you hit submit then a required field is not complete. The problem is most likely not with your e-mail address and the statement in italics on the form about a valid e-mail address being required is not an error message. Check for error messages in RED next to each field and follow the instructions. You may have to scroll down the page to review each field.

**I can't access the link in the Complete Ripoff Report e-mail message to get to confirmation page. How do I complete my registration?**

If you are unable to follow the confirmation link in the e-mail message copy and paste the following link into your browser: http://www.ripoffreport.com/login.aspx. Enter the e-mail address and confirmation code sent to you to activate your account.

**How can I change my e-mail address?**

If your e-mail address has changed, login to Ripoff Report using your old e-mail address and password. Then go to Edit Profile, http://www.ripoffreport.com/MyProfile.aspx and enter your new e-mail address. You will also be able to update other account information.

Once you update your e-mail address an e-mail message will be sent to you with a confirmation code. It may take 5-10 minutes for you to receive this e-mail. If you don't receive it check your Junk E-mail or Spam Quarantine folder.

Follow the link in the e-mail message or go to http://www.ripoffreport.com/login.aspx and enter your e-mail address and confirmation code to activate your account and update your e-mail preferences.

**I am trying to file a rebuttal to an existing report, why does the site asks me to register or login?**

Ripoff Report has updated its registration process to verify e-mail addresses. If you have filed rebuttals in the past but have not filed an actual report you may need to register as a new user, http://www.ripoffreport.com/register.aspx.

**After I login the site takes me back to the registration page? How do I get out of this and file a report?**

The site may display the Register/Edit Profile page after you login if you have used Ripoff Report in the past. The Edit Profile page should contain your account information. Please take a moment to make sure the information is accurate and click Update. After updating this information use the File button on the top of any page to file a report.

**How do I submit an update to a report I filed?**

Changes to your Ripoff Report can be made at any time by sumbitting an Update, http://www.ripoffreport.com/MyReports.aspx. You must Login, https://www.ripoffreport.com/login.aspx, to verify your identity. This will assure that you will be the only one sumbiting updates to your report. If your complaint is resolved or situations get even worse, you can always update your Ripoff Report with your new updated information. Reports can only be updated and not removed.

**What is the Ripoff Report?**

Ripoff Report is a service to the world's consumers. The Ripoff Report enables YOU the consumer to be armed with the opinions and comments of your fellow consumers. This report will help you exercise your first amendment right to freedom of speech. By using our forum, you will have an opportunity to speak out against companies, businesses, governments, and individuals that have treated you unfairly. The bad Business Bureau's ... **Ripoff Report** will help you do that! Once your report is posted, millions of fellow consumers worldwide will have access to your information!

**How do I file a Ripoff Report?**

1. **Select the "File Your Ripoff Report" button.**
   1. Enter your e-mail address
   2. Enter a password

**This information is required so that you may come back at any time to add additional information to your report.**
*Once you give us the required information, you're ready to file your Report.*

1. **File your Report, which consists of 6 easy steps.**
   Your Ripoff Report consists of 5 main parts:
   1. Give all the Company or Individual's vital information, names they go by, complete address, phone numbers, e-mail and web address.

2. Title your report using descriptive words, describing what they did to you.
3. Write your report in detail.
4. Categorize your report by selecting from our list of categories.
5. Add a link to your Report, which will link your report to all the other Ripoff Reports already filed on the same Company or Individual.
6. CLICK ON Submit your report, and your finished!

*Your Ripoff Report will be available for the world to see as soon as you click on the submit button. This will also send it to our database, then your report is automatically submitted to all the search engines for other consumers to see!*

### How secure is my personal information?

**VERY.** All Ripoff Reports are strictly confidential. We will not sell your e-mail address or any other information that you have given us. We simply use it to identify the complaint. At the most, we may e-mail you if we need additional information on your Ripoff Report.

### Are Ripoff Reports ever censored?

No way! Ripoff Report ™ does not provide or create any content in the reports or the titles. Ripoff Report may delete repetitive information in the title that may be caused mistakenly by mechanical entry, and Ripoff Report and will delete any profanity. So go ahead, speak your mind! We will not edit, censor, or manipulate your Ripoff Report in any way. We provide this service for you. We believe it is imperative that information listed on this site is unedited and straight from the source.

### Can I update my Ripoff Report?

Certainly... Changes to your Ripoff Report can be made at any time by submitting an UPDATE. Your identity will be verified with your e-mail address and your password. This will assure that YOU will be the ONLY one submiting UPDATES to your report. If your complaint is resolved or situations get even worse, you can always UPDATE your Ripoff Report with your new updated information. Reports can only be updated and not removed.

### What makes a good Ripoff Report?

The report should be relating an honest, factual, and impartial story. Make your statement as objective as possible.

Report both sides to the story. Saying, "Joe Schmoe's company --ks" is neither informative, nor respectable. Reporting a false statement can get you sued.

*Use any details such as names, times, places, tape recorded evidence (where legal), pictures, and witnesses statements, that will reveal the facts and support your Report. These items could be submitted to us to be made a part of your actual report...*

### How can my story be featured on the Home page?

Some stories will be picked for the front page. To be eligible, your story needs to be especially convincing. A clear photo, drawing or cartoon that's related to the RipOff subject is required by e-mail or snail-mail. After submitting your Ripoff Report, e-mail us what you have at frontpage@Ripoff Report.

### How Does the Ripoff Report compare to the Better Business Bureau?

The "Better Business Bureau" is another avenue to make your voice heard and to seek possible satisfaction of your grievance. With the Better Business Bureau, a business that is the focus of a complaint merely has to respond to the complaint in order to "satisfy" it most of the time. You won't be told of past satisfied or unsatisfied complaints about a company. So if you check on a company that has "satisfied" all their complaints, they will tell you that, "they have a satisfactory rating". You will never know their track record!

The *bad*Business Bureau's Ripoff Report is a more consumer oriented forum for keeping track of "bad business". Unlike the Better Business Bureau, all of your unedited, uncensored, complaints can be made public to millions world wide. You can see the track record of a company's past. The "bad Business Bureau's" Ripoff Report is an important resource to keep you informed of those you deal with. Soon this sight will be **THE source of information** that "bad business" will want to avoid world wide.

### How do I send photos to go with my Ripoff Report?

1. You need to scan your pictures and send them in a jpeg format
2. You need to tell us what sentence or paragraph to put the picture before or after.
3. You should also give us the caption that goes with it.
4. You can send us as many pictures as you want.
5. Send them 1 picture at a time by e-mail in the order of importance.
6. You must fill in the e-mail subject with the following information: **PHOTO for Report** (copy and paste the web address of your report)
7. Your photos need to be clear.
8. Email us at photos@ripoffreport.com or if you do not have the ability to produce a digital photo you may mail them to us at:

Ripoff Report
P.O. Box 310
Tempe, Arizona 85280

Legal Disclaimer

Thank you for visiting our Ripoff Report web site. By viewing this site you agree that you will not hold the Ripoff Report or
any of their owners, employees or entities responsible for any information contained herein. The Ripoff Report is a non-
substantiated source of information. The information provided in the Ripoff Report is the sole creation of consumers from
the general public. Please verify any claims that are made in this site, and make your own decisions about any companies
and individuals listed within. Warning! The content within may be offensive, due to the unedited nature.

Ripoff Report
Don't let them get away with itTM.
Make sure they make the Ripoff Report!

We are not lawyers.
We are not a collection agency.

We are Mediators.
We are Consumer Advocates.
We are Civil and Human Rights Activists

We are a Nationwide Consumer Reporting News Agency
...by consumers, for consumers

Ripoff Report



**DONATIONS may be sent to and
USA Victims and Volunteers respond to:**
PO Box 310, Tempe, Arizona 85280
United States FAX: 425-799-9729

E-mail us: EDitor@RipoffReport.com

Remember. Don't let them get away with it...let the truth be known!



## Ripoff Report

| Home | File a Report | Consumer Resources | Search | Link to Ripoff Report | Contact Us | Email Us |
| Privacy Policy | Terms of Service | FAQ | About Us | Why Ripoff Report will not release author information! |
| Thank You Emails! | Corporate Advocacy Program: How to repair your business reputation. | Ed Magedson - Ripoff Report Founder |
| Want to sue Ripoff Report? | Donate to our Legal Defense | BadBusinessBureau.com |

Copyright © 1998-2012, Ripoff Report. All rights reserved.

# EXHIBIT J

Ripoff Report | Ripoff Report VIP Arbitration Program. Remove Rip-off ...putation Management services can't delive... | Complaint Review· 626838          3/13/13 1:51 PM

Is there a Ripoff Report about you!? SEO Reputation Management WARNING!    Click Here Now!

**Ripoff Report** | Complaints Reviews Scams Lawsuits Frauds Reported. File your review. Consumers educating consumers.™

By consumers, for consumers...

Don't let them get away with it.® Let the truth be known!™

**Home     Help**                                                                                          **Register to File a Report     Login**

FILE A     Update     Latest     Consumer     Consumers     Legal          Repair your reputation the right way     Complaints Reviews or Frauds?™
REPORT     a Report     Reports     Resources     Say Thank You   Directory     **Corporate Advocacy**

■ Ripoff Report protects consumers first amendment right to free speech        **Review Latest Reports     Advanced Search     Browse Categories**



**Report: #626838**

# Complaint Review: Ripoff Report VIP Arbitration Program. Remove Rip-off Report? Better yet! Ripoff Report VIP Arbitration Program. Reputation Repair & Reputation Management services can't deliver.

**Related Ripoff Reports**

Western Sky/Cash Call RIPOFF
COMPANY ANAHEIM, California

My Computer works This company
is a ripoff Internet, Arizona

Service Foods REVIEW: Customer
Satisfaction Commitment: 100%
guarantee for a full 12 months after
delivery. Service Foods Inc
revamped departments, health and
nutrition solutions Service Foods
provides for families throughout the
southeast. *UPDATE: Recognized
by Ripoff Report Corporate
Advocacy Business Remediation
and Customer Satisfaction Program
- Service Foods Inc pledges to
always resolve any issues, feel
safe, confident & secure when
doing business with Service Foods.
Ripoff Report Verified™

**Featured Ripoff Reports**



Ben Smith Sac County
Iowa Attorney
prosecutorial
misconduct, improper
relationship with star
witnesses, allowing
witnesses to knowingly

**Submitted:** Tuesday, July 27, 2010    **Posted:** Wednesday, May 30, 2012    **Reported**
**By:** ED Magedson - Founder, Rip-off Report — **Tempe Arizona** USA

**Ripoff Report VIP Arbitration Program. Remove Rip-off Report?**            **Phone:** 602-359-
**Better yet! Ripoff Report VIP Arbitration Program. Reputation**             4357 x5
**Repair & Reputation Management services can't deliver.**                    **Web:**
PO Box 310                                                                    www.ripoffreport.com
Tempe, Internet Arizona 85280                                                 **Category:** On-Line
United States of America                                                      Business

Ripoff Report VIP Arbitration Program. Remove Rip-off Report? Better yet! Ripoff Report VIP Arbitration Program. Reputation Repair & Reputation Management services can't deliver. ED Magedson explains Ripoff Report VIP Arbitration Program. Is your company the subject of a false Report? Do you feel a free rebuttal is just not enough? Would you like the opportunity to prove that the Ripoff Report about you or your business is false? Would you like false statements of fact redacted from the report? Rip-off Report has contracted with private arbitrators who have extensive



Advertisers above have met our
strict standards for business conduct.

Case 2:13-cv-01823-R-RZ  Document 1  Filed 03/14/13  Page 96 of 102  Page ID #:103

Ripoff Report | Ripoff Report VIP Arbitration Program. Remove Rip-off ...putation Management services can't delive... ; Complaint Review: 626838          3/13/13 1:51 PM

lie. Tracey Richter
Roberts falsely
convicted, overwhelming
evidence leads to
estranged husband
Michael Roberts,
Rexxfield failed
polygraph, witness
intimidation, evidence
tampering, Iowa Division
of Criminal Investigation
corruption.

The New "Digital Extortion"
**Is there a Ripoff Report on you?**



**Reputation Management
SEO WARNING!**
They might contact you next:

Past Featured Reports

Ripoff Reports


Kristine Dee Grant
Tolliver and Tilford
Laron Young Kris
and Till CoreLogic
Accounting Exec
Kristina Grant
Tolliver and her Live-
In TDCJ Parolee Boyfriend, Tilford
Laron Young Ran Car Title Loan
Scam on Craigslist Fort Worth,
Texas


Ji Monne Jason
Iverson
Uncertified
Marine
Mechanic who
does not back
up his work Buckeye, Arizona


Midwest Realty
Services Abuse
of Alleged
Repair/Rental
Charges for
Property...
Internet


Flvtor.com
Thompson's
Advertising
Kenny
Thompson (owner) There is no way
be delivered 10,000 door hangers
(which is what I paid for). Brea,
California


Phil Sears Phil
Sears
Collectibles
Walt Disney
Gallery Of
Forgeries by
Phil Sears - WARNING HE SELLS
FAKES! I Laguna Niguel, California


Sherolof Salmon
Auto Super
Store
Fraudulent
Powertrain
Warranty,
Typical Hard Sell, Double talk
Rome, Georgia

Amir Kianzad Amir
Kianzad (oracle)
Amir Kianzad is a
liar, thief and a
con man oxford,
Nationwide

experience, including judges, to decide
your case. Clear your name once and for all
the right way. Tempe, Internet, Arizona



Tweet 2        Like 8

REBUTTAL BOX | Respond to this Report!

| Add Rebuttal to this Report | Aribitrate & Set Record Straight |
| File New Report | Repair Your Reputation |

You have heard the promises:

*"Delete ripoff report, improve your online credibility, Remove ripoff report, reputation management for ripoffreport, positively boost your business reputation, repair your reputation." The promises are endless. Isn't it better to prove that statements about you or your business are not true? ..Ripoff Report VIP Arbitration Program .. don't listen to online reputation management specialists about repairing your damaged online reputation and improving your company's online reputation. Instead, read about Ripoff Report VIP Arbitration Program.. Sweeping consumer comments under the rug never works. Consumers will always find them and you will always have to keep paying for reputation management services.*

By ED Magedson – Founder, Rip-off Report

1        0        0
Author  Consumer  Employee/Owner



Does your business have a bad reputation?
Fix it the right way.
**Corporate Advocacy Program™**
SEO Reputation Management
at its best!





If you have 1 or 2 Ripoff Reports, this program may be right for you.

Are you the subject of a false Ripoff Report?

Do you feel like the free rebuttal is just not enough?

Would you like the opportunity to prove that the report about you is false?

Would you like false statements of fact redacted?

If you answered yes to any of these questions, then Ripoff Report's new VIP Arbitration Program may be right for you. We developed the program in response to phone calls and emails from businesses like you -- those who have worked hard to create a good reputation and are having that reputation unjustly tarnished because of a false posting on Ripoff Report.

Because Ripoff Report has never had the internal resources to investigate reports that a business claims is false, it has always permitted the subject of the report to file its own, free, rebuttal. But some of you feel that is not enough. You have asked for more. You want the ability to prove it is false. You want an independent investigation. Perhaps most importantly, you want the false statements removed. We listened to your concerns and are launching VIP Arbitration in response.

Here's how it works.

We have contracted with private arbitrators who have extensive experience, including experienced judges in court. Once the program builds momentum, we will add other highly qualified arbitrators to our panel. You submit a written arbitration statement identifying the false statements in the report, or explaining that the report was posted by

Case 2:13-cv-01823-R-RZ   Document 1   Filed 03/14/13   Page 97 of 102   Page ID #:104

Ripoff Report | Ripoff Report VIP Arbitration Program. Remove Rip–off ...putation Management services can't delive... Complaint Review 626838        3/13/13 1:51 PM



a competitor pretending to be a customer. You are also given the opportunity to support your position with documented evidence and/or sworn affidavits. There is a filing fee of $2,000 to pay for the arbitrator's time and for administration of the program. The author of the report is then given the opportunity to respond and you are given the opportunity to reply.

**The arbitrator then reviews all of the submissions and renders a written decision.**

This decision will be posted into the title of the Report.



STB Entertainment Steve Child Predator Leflar Child Predator Steve Leflar, STB Entertainment www.stevensmusic.biz. Simply the Best Entertainment; Steve Thief Leflar Steve Child Preralor Leflar assistant Eric Symons. internet stalkers, child predator Leflar monein part, California

In the event that the arbitrator determines that the Report is true, there will be no updates or changes to the website. If the Arbitrator finds that statements in the report are false, the title of the report will be updated, posting this phrase BEFORE the original title: **"Notice of Arbitrator Decision: A neutral and independent arbitrator has determined that the following Report contained one or more false statements of fact. The false statements have been redacted."** The arbitrator's decision will be posted in its entirety after the title and before the original content of the report. Any statements of fact that the arbitrator determines to be false will be redacted from the original report.



rapetrac gas station Malfunctioning equipment ineffective lying management. Gas spilled all over. No clean up. Internet

If you think this program may be right for you and you would like more information, e-mail us here to request a copy of the complete rules and an arbitration agreement. arbitration@ripoffreport.com



charity vending I purchased 50 candy boxes from wayne berger at charity vending over 4 months ago with the guarantee that they would be located with in a week. Internet

------------------------------------------------------------------------------------

**FREE.**

If you are a business with one or more reports filed against you, you can make it right. If handled correctly, Ripoff Report(s) filed against you can actually help improve your credibility and reputation. We offer you the opportunity to file a FREE REBUTTAL to any report. (See the RESPOND rebuttal box at the end of the specific Ripoff Report you wish to comment on). Every company receives complaints, but how they handle those complaints separates good business from bad business.



Taquarius Ford and Konita Pinnsler Danny Iylic. T diddy, Renters Real Estate Fraud, Entertainment Industry Fraud!!! New york, New York

**If you have more than 2 Reports, take a look at another program we have. Corporate Advocacy Program**

Businesses that want to make a real difference should read about the very successful, groundbreaking and innovative program that both businesses and consumers are raving about. This program is a way businesses can turn negatives into a positive. Ripoff Report Corporate Advocacy Business Remediation and Customer Satisfaction Program is a program that benefits the consumer, assuring them of complete satisfaction and confidence when doing business with a member business. This kind of assurance will get the member business, more business.



Luxury watches R us Antique Trading Com Bare & Switch luxury watch operation; Robert & Carino - beware of these people; be sure to protect yourself and document all your and their moves Miami, Florida

**Rip-off Report Corporate Advocacy, Business Remediation and Customer Satisfaction Program.**

*A program that benefits the consumer, assures them of complete satisfaction and confidence when doing business with a member business.*



Epic 2 News Hall of Shame Charlie LeDuff intoxicated whores aggravated assault got into a brawl Detroit, Michigan

*Consumers love to do business with a company that can admit mistakes* and show *what changes they've made to avoid problems in the future..*



The White House I accuse them of using manipulated and fraudulently translated information in the speech of President Obama. Washington, District of Columbia

If you have any questions or comments about Ripoff Report VIP Arbitration Program or the Corporate Advocacy Business Remediation and Customer Satisfaction Program, please email us... Your questions, comments and suggestions are always welcome and will be considered even if we don't agree with them. Please realize Rip-off Report is charting new territory, working to make a change for both consumers and businesses alike.



Paul J. Lassasey Amstone Investments, LLC A theft story, using the barrier of cost in civil litigation to steal assets Vero-Beach, Florida

ED Magedson - Founder EDitor@RipoffReport.com www.ripoffreport.com



American Home 4 Rent, LLC American Homes 4 Rent Properties Three, LLC. Offers to Purchase almost 200 homes in Milwaukee but

..by consumers, for consumers

Case 2:13-cv-01823-R-RZ Document 1 Filed 03/14/13 Page 98 of 102 Page ID #:105

Ripoff Report | Ripoff Report VIP Arbitration Program. Remove Rip-off ...putation Management services can't delive... Complaint Review: 626838    3/13/13 1:51 PM




Citizens of the United States of America ALLOWS MURDER OF INNOCENT POOR PEOPLE IN THIS COUNTRY
Washington District of Columbia



Stamford Global stamford global magyarorszÁg, Stamford Global hungary Kft., SG
MAGYARORSZÁG KFT., SG Magyarország Vezetõ Álbõzo Kft. Stamford Global, a SCAM training company for Project Management. HR Project and Key Account Management Masterclasses. Very BAD quality training and too expensive. This people only care about money. no BudaMörk, Hungary



Rise Above Theatre Movement
RATMO. kp productions. Kenne Guillory. James Hart RATMO's owner lies and sexually harass his employees. Los Angeles, California



Justin Lewis Niche Optimizer Thief. Charlatan. Liar. Unethical.
Internet

Excessive TVs Canada Mahensingh
Gunoah Was sold a Postage Meter that "I" thought was purchased not rented. Brampton, Ontario Canada



Dale Galbraith Cerastone. Betty Galbraith. Ballinder Singh Kooner Dale Galbraith - A continuous
history of conning people. Internet



National Multi List Service
Company is not honest, liars, scammers Edgewater, Colorado



Kanoa Hair Care Shop Kanoa Owner of Kanoa Hair Care
www.ShopKanoa.com is a class A Scam Artist Internet



Vista Ballroom. Erin Bolshakov the most disgustingly stuck up snop you can imagine. She may start out nice at first but stick around long enough and she will show you her true colors. I have personally seen her be rude to loyal o Internet South Carolina



Spray Tan LA and Rob Lonardo Robert Lonardo COnsulting Racist. Hates Blacks and Jews. Theft. Steals Money. Jail Houston, Texas

---



businesses you can trust!

Remember. Don't let them get away with it!™ Make sure they make the Rip-off Report™

**Written by,**

**..Ripoff Report** *Corporate Advocacy Business Remediation and Customer Satisfaction Program team..*
..by consumers, for consumers

# Ripoff Report.

PO BOX 310, Tempe, AZ 85280
602-359-4357 when selection starts, press 5 ...then, three seconds later press 1... Say who you are!

**Our mission:**

- *Empower* consumers
- ***Defend*** the First Amendment
- *Expose wrongdoing*
- Help companies *regain control*
- 

ED Magedson: Founder, Ripoff Report
- Follow **Ripoff Report** on Twitter
- Follow me, **Ed Magedson**, on Twitter
- Find us on Facebook

This report was posted on Ripoff Report on 7/27/2010 1:02:19 PM and is a permanent record located here: http://www.ripoffreport.com/remove-a-report/vip-arbitration-program/ed-magedson-explains-7ad2e.htm. The posting time indicated is Arizona local time. Arizona does not observe daylight savings so the post time may be Mountain or Pacific depending on the time of year

Ripoff Report has an exclusive license to this report. It may not be copied without the written permission of Ripoff Report.

[Click Here to read other Ripoff Reports on Ripoff Report](#)

**Search for additional reports**
If you would like to see more Rip-off Reports on this company/individual, search here:

| Ripoff Report | Search | Search Tips |
|---|---|---|

## Report & Rebuttal

| **Respond to this report!** | **Also a victim?** | **Repair Your Reputation!** |
|---|---|---|
| File a Rebuttal | File a Report | Get Started |

## Arbitrate

**Remove Reports?**
No! Better yet! Arbitrate to set the record straight!

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Manuel Real and the assigned discovery Magistrate Judge is Ralph Zarefsky.

The case number on all documents filed with the Court should read as follows:

## CV13- 1823 R (RZx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

Unless otherwise ordered, the United States District Judge assigned to this case will hear and determine all discovery related motions.

==================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[✓] **Western Division**
    **312 N. Spring St., Rm. G-8**
    **Los Angeles, CA 90012**

[ ] **Southern Division**
    **411 West Fourth St., Rm. 1-053**
    **Santa Ana, CA 92701-4516**

[ ] **Eastern Division**
    **3470 Twelfth St., Rm. 134**
    **Riverside, CA 92501**

Failure to file at the proper location will result in your documents being returned to you.

David P. Beitchman, SBN 198953
dbeitchman@bzlegal.com
BEITCHMAN & ZEKIAN, P.C.
16130 Ventura Blvd., Suite 570
Encino, CA 91436
Tel. (818) 986-9100

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| AMIR HESHMATPOUR, an individual, | CASE NUMBER |
|---|---|
| PLAINTIFF(S) | **CV13-01823** R-(RZx) |
| v. | |
| ALI ESMAILI, an individual; SOHRAB SEPEHRAN, a/k/a SASHA SEPEHRAN, an individual; XCENTRIC VENTURES, LLC, an Arizona limited liability company; and DOES 1 through 10; inclusive | **SUMMONS** |
| DEFENDANT(S). | |

TO:     DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, _David P. Beitchman, SBN 198953_____, whose address is _Beitchman & Zekian, P.C.; 16130 Ventura Blvd., Suite 570, Encino, CA 91436_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: MAR 1 4 2013

By: _____
**JULIE PRADO**
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| AMIR HESHMATPOUR, an individual | ALI ESMAILI, an individual; SOHRAB SEPEHRAN, a/k/a SASHA SEPEHRAN, an individual; XCENTRIC VENTURES, LLC, an Arizona limited liability company; and DOES 1 through 10, inclusive |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| David P. Beitchman, SBN 198953; BEITCHMAN & ZEKIAN, P.C. 16130 Ventura Blvd., Suite 570, Encino, CA 91436 Email: dbeitchman@bzlegal.com; Tel. (818) 986-9100 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:**  JURY DEMAND: ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☑ No   ☑ MONEY DEMANDED IN COMPLAINT: $ To be Proven at Trial

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Libel Per Se, Defamation, Trade Libel, Intrusion, Public Disclosure of Private Facts, False Light, Civil Extortion, Tortious Interference with Business Advantage, etal

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☑ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

CV13-01823

FOR OFFICE USE ONLY:  Case Number

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)      CIVIL COVER SHEET      Page 1 of 2

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No  ☐ Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No  ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)  ☐ A.  Arise from the same or closely related transactions, happenings, or events; or

☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:**  (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| County of Los Angeles | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| County of Los Angeles | Phoenix, Arizona |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| County of Los Angeles | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X.  SIGNATURE OF ATTORNEY (OR PRO PER): _____  **Date** March 12, 2013

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability  (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |